WISCONSIN DEPARTMENT OF REVENUE,
Petitioner-Respondent-Petitioner,

v.

MENASHA CORPORATION, Respondent-Appellant.

Supreme Court

*No. 2004AP3239. Oral argument November 29, 2007.*
*—Decided July 11, 2008.*

2008 WI 88

(Also reported in 754 N.W.2d 95.)

For the petitioner-respondent-petitioner the cause was argued by *F. Thomas Creeron III*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the respondent-appellant there were briefs by *Andrew L. Nelson, Michael B. Van Sicklen*, and *Foley & Lardner LLP*, Madison, and *Maureen A. McGinnity* and *Foley & Lardner LLP*, Milwaukee, and oral argument by *Maureen A. McGinnity*.

An amicus curiae brief was filed by *Rebecca Kathryn Mason, Brady Williamson,* and *Godfrey & Kahn, S.C.*, Madison, on behalf of Wisconsin Manufacturers & Commerce.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published court of appeals' decision,[1] which reversed the decision of the Dane County Circuit Court, Steven D. Ebert, Judge. In the underlying dispute between Menasha Corporation (Menasha) and the Wisconsin Department of Revenue (DOR), the Wisconsin Tax Appeals Commission[2] (Commission) concluded that the "R/3 System," which Menasha purchased from SAP, was a custom computer program under Wis. Admin. Code § Tax 11.71(1)(e) (Sept. 2006),[3] and thus, the R/3 System was exempt from sales and use tax. *See* Wis. Stat. § 77.51(20) (2003–04).[4] The DOR appealed that

---

[1] *DOR v. Menasha Corp.*, 2007 WI App 20, 299 Wis. 2d 348, 728 N.W.2d 738.

[2] The Wisconsin Tax Appeals Commission decision, *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) ¶ 400–719 (WTAC 2003) is also available as Docket No. 01-S-72 (filing 12/01/03) at http://www.wisbar.org/AM/CustomSource/ASPCode/caseindex.asp?Area=4 (last visited 07/01/08).

[3] All subsequent references to the Wisconsin Administrative Code are to the September 2006 version unless otherwise indicated.

[4] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

Wisconsin Stat. § 77.51(20) provides:

"Tangible personal property" means all tangible personal property of every kind and description and includes electricity, natural gas, steam and water and also leased property affixed to realty if the lessor has the right to remove the property upon breach or termination of the lease agreement, unless the lessor of the property is also the lessor of the realty to which the property is affixed. "Tangible personal property" also includes coins and

decision to the Dane County Circuit Court. The circuit court reversed the Commission's decision and concluded that the R/3 System was a non-custom software program and thus was taxable as tangible property. Menasha then appealed that decision to the court of appeals. The court of appeals reversed the circuit court's decision and therefore affirmed the Commission's initial decision that the R/3 System was custom and thus exempt from sales and use tax. We affirm the court of appeals' decision.

stamps of the United States sold or traded as collectors' items above their face value and computer programs except custom computer programs.

Wisconsin Admin. Code § Tax 11.71(1)(e) provides:

"Custom programs" mean utility and application software which accommodate the special processing needs of the customer. The determination of whether a program is a custom program shall be based upon all the facts and circumstances, including the following:

1. The extent to which the vendor or independent consultant engages in significant presale consultation and analysis of the user's requirements and system.

2. Whether the program is loaded into the customer's computer by the vendor and the extent to which the installed program must be tested against the program's specifications.

3. The extent to which the use of the software requires substantial training of the customer's personnel and substantial written documentation.

4. The extent to which the enhancement and maintenance support by the vendor is needed for continued usefulness.

5. There is a rebuttable presumption that any program with a cost of $10,000 or less is not a custom program.

6. Custom programs do not include basic operational programs or prewritten programs.

7. If an existing program is selected for modification, there must be a significant modification of that program by the vendor so that it may be used in the customer's specific hardware and software environment.

¶ 2. This appeal presents the following two issues: (1) what is the proper level of deference that this court should give to the Commission's decision; and (2) did the Commission reasonably conclude that the R/3 System was a custom program and therefore not subject to sales and use tax.

¶ 3. As to the first issue, we consider the level of deference that this court must give to the Commission's interpretation of the statute and the administrative rule. As a part of that determination, we also consider whether the Commission was required to give deference to the DOR's interpretation of Wis. Admin. Code § Tax 11.71(1)(e). We conclude that the Commission's statutory interpretation of Wis. Stat. § 77.51(20) is entitled to due weight deference and that its rule interpretation of Wis. Admin. Code § Tax 11.71(1)(e) is entitled to controlling weight deference. We further conclude that when a DOR decision is appealed by the taxpayer to the Commission, the Commission is not required to give deference to the DOR's interpretation of Wis. Admin. Code § Tax 11.71(1)(e) when deciding that appeal.

¶ 4. The second issue this court must decide is whether the Commission reasonably concluded that the R/3 System was a custom program and therefore not subject to sales and use tax. We conclude that when applying the controlling weight deference standard to the Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e), the Commission reasonably interpreted the rule and concluded that the R/3 System was custom.

¶ 5. This decision has great import to the average taxpayer in this state. More typically, it is the individual taxpayer who seeks a fair and neutral hearing before the Commission when that person believes that he or

she has been taxed incorrectly by the DOR. If the Commission must defer to the DOR, the average taxpayer does not receive a fair hearing before a neutral tribunal. Although the Commission is subject to judicial review, the legislature specifically charged the Commission as "the final authority for hearing and determination of all questions of law and fact" under the tax code. We must not second guess that act of the legislature.

## I. UNDISPUTED FACTS

¶ 6. The Commission made the following findings of fact in the underlying dispute:[5] Menasha is a Wisconsin corporation with headquarters in Neenah, Wisconsin. It has more than 5,700 employees and main-

---

[5] At summary judgment before the Commission, Menasha submitted its proposed Undisputed Material Facts. In response, the DOR agreed with the bulk of Menasha's submissions and submitted additional proposed Undisputed Material Facts. On facts with which the parties agree, the Commission treated the agreements as a stipulation of facts. Where disagreements arose, the Commission addressed the differences and resolved any disagreements. *Menasha Corp. v. DOR,* Wis. Tax Rptr. (CCH) ¶ 400–719, at 32,849–54 (WTAC 2003). At the court of appeals, the DOR argued that there were genuine issues of material fact and thus summary judgment was improperly granted. The DOR challenged two undisputed facts at the court of appeals. However, the court of appeals affirmed the Commission's conclusions and stated, "we agree with the commission that the arguments the DOR raises in relation to Undisputed Material Facts #29 and #47 are either unsupported by the evidence or do not otherwise create a genuine issue of material fact." *Menasha,* 299 Wis. 2d 348, ¶ 41. Thus, the court of appeals concluded that summary judgment was proper. The DOR did not raise this argument with this court, although it did comment on the Commission's action regarding some facts in its statement of the case. Accordingly, we treat the facts found by the Commission as undisputed.

tains 63 business locations in 20 states and 8 countries. In 1993, Menasha, in an effort to address shortcomings in its systems, hired an independent accounting firm to evaluate its business and accounting software systems. Menasha sought an application software system that would accommodate its special processing needs. The independent consultant recommended that Menasha "standardize its systems by implementing a single business software environment to serve as the foundation information system for all of [Menasha's] business locations." The independent consultant also recommended that another consulting firm conduct feasibility studies to determine if a software system could integrate all of Menasha's subsidiaries. With its consultants, Menasha concluded that "one" global application software system was feasible for Menasha's needs, but "this conclusion was predicated on locating a software system which would allow custom modification to meet [Menasha's] unique business requirements."

¶ 7. In April of 1995, Menasha began discussions with SAP regarding its R/3 System and made it clear that "a critical factor in its selection of a software system was one that could be customized to fit its business needs." The initial R/3 System consists of more than 70 software modules each of which is designed to "provide a rudimentary business and accounting computer software system for a segment of the client's business" such as "accounting and finance" or "personnel." The client, in this case Menasha, can select the modules it wishes to use. SAP provides a company, such as Menasha, with CD-ROMs containing all of the R/3 System modules, but SAP provides the client with the access codes only for modules that the client licenses for its particular business operation.

¶ 8. "As provided, the basic modules of the R/3 System contain a business and accounting system that must be customized to fit a client's business operations." "It is only after this customization process is completed that the client has a usable software system that will serve its business and accounting needs." In other words, the system is not usable to a client as sold and must be modified to fit a client's business operations. By use of a computer language—ABAP/4—the R/3 System is customized. However, "the ABAP programming is part of a larger development environment within the R/3 System called the Development Workbench, which offers many tools for customizing the R/3 System to fit a customer's business needs." SAPScript is used, within the Development Workbench, to create client-specific forms. Data Dictionary Objects "is used for changing and adding fields to tables provided by the basic R/3 System modules," and Data Dictionary Objects "is also used to create search helps" and "to create indices to make table access times more efficient."

¶ 9. "The two most common uses for ABAP are to permit the design of custom reports and to develop custom interfaces for the R/3 System." However, the ABAP programming is also used in the "creation of conversion programs that change data into a format usable by the R/3 System, and the creation of custom programs to run parallel to the R/3 System to fulfill business functions not provided by the R/3 System." By virtue of the licensing of the R/3 System, SAP customers "almost always retain either SAP or SAP's designated consultants to assist" in customizing the basic R/3 System.

¶ 10. When arguing to the Commission, the parties disagreed over how to characterize the sophistication of the initial or basic R/3 System modules that are

provided to all customers. Menasha argued that the R/3 System provided "only a very basic" business and accounting system. The DOR, on the other hand, argued that the modules provided a "sophisticated" business and accounting system. The DOR cited to two treatises on implementing the R/3 System for its assertions regarding the sophistication of the R/3 System. The Commission, however, concluded that excerpts from the treatises that the DOR cites to "appear to describe the overall R/3 System and do not specifically address the [initial or basic] R/3 System modules." Furthermore, the Commission concluded that the "sophistication of the modules is largely immaterial because both parties agree that the R/3 System modules are only usable once the software system has been customized."

¶ 11. On April 20, 1995, SAP conducted a demonstration of its R/3 System. Following the initial demonstration, SAP was asked to conduct a demonstration with sample data from Menasha. Prior to preparing the demonstration, SAP spent a number of days at Menasha collecting information regarding Menasha's business operations, and SAP had extended conversations with Menasha's officers and employees regarding its diverse operations. It took SAP four weeks to prepare the demonstration. Menasha subsequently requested additional explanations and clarifications on the modification tools and techniques available within the R/3 System and a demonstration of the ABAP programming tools used to make modifications to the system.

¶ 12. Menasha understood that the requisite customization process could take years to complete and would cost tens of millions of dollars. Menasha's budget for purchasing the R/3 System included the costs that it expected to pay both SAP and SAP's designated consultants for the configuration, modification, and cus-

tomization of the R/3 System. In addition, Menasha understood that "without this customization, the system would be of no value to its operations." "The customization was necessary to justify any amount spent on the licensing of the basic R/3 System modules." Menasha's board of directors approved the licensing of the R/3 System acknowledging that the projected cost of implementation would be approximately $46,575,000.

¶ 13. Menasha purchased the R/3 System from SAP on September 27, 1995, for $5.2 million. The licensing agreement contained no provision for customization of the R/3 System by SAP. However, SAP had advised Menasha during the course of demonstrations that because of the complexities of the system and substantial customization necessary to make the R/3 System usable, Menasha would be required to retain either SAP consultants or a consultant designated by SAP. Because SAP was unable to supply all of the necessary consultants for the installation and customization of the R/3 System, Menasha would have to work with one of the SAP designated consultants. Menasha chose ICS Deloitte (ICS) as its designated SAP consultant.

¶ 14. From September 1995 until March 1996, Menasha worked with ICS to analyze Menasha's systems, prepare Menasha's hardware for installation, and begin introducing Menasha's technology team to the intricacies of customizing the R/3 System. During the pre-installation phase, SAP representatives provided training and other support such as: providing a single point of contact for all questions, concerns, and communications; keeping abreast of project plans and status; providing SAP issue resolution and escalation; providing input as an implementation consultant; scheduling of professional services from SAP; assisting

in creating a training curriculum; assisting with the planning and execution of the project plans; and communicating SAP product information.

¶ 15. The R/3 System was delivered to Menasha on multiple CD-ROM disks. Initial installation began on March 25, 1996, and downloading was complete on March 27, 1996. A former employee of SAP loaded the R/3 System onto a new computer purchased by Menasha. This former SAP employee was retained for the specific purpose of providing support in the initial installation of the system. During this time, SAP's former employee had access to SAP's online support system.

¶ 16. The R/3 System, upon delivery, did not provide adequate processing for Menasha. Each subsidiary put together an implementation team consisting of Menasha's information support personnel, SAP representatives, ICS representatives, and other third-party consultants. "The members of the implementation team worked under the direction of SAP and ICS [] to determine the operational and functional needs of each of [Menasha's] subsidiaries in order to configure and customize the basic modules of the R/3 System to fit the needs of each subsidiary." If the implementation team was not able to configure and modify the R/3 System, the team would refer the problem—described as a "functional gap"—to the ABAP programming team. "The programming team's job was to draft ABAP code to fill the functional gaps or to integrate the R/3 System with other systems that could provide the functionality required by the subsidiary." The ABAP programming team was directed by SAP and ICS and included people from Menasha and third-party consultants. Menasha contracted with SAP to provide an on-site programmer

who worked with the ABAP programming team and became a member of a subsidiaries' programming team.

¶ 17. The implementation and ABAP programming team members worked to customize the R/3 System from March 27, 1996, to January 1, 1997, in order to meet Menasha's functional needs. "[T]he ABAP programming team created codes for hundreds of user exits to the R/3 System to integrate external programs with the R/3 System." In addition, "the ABAP programming team created new subsystems to run parallel to the R/3 System for operations that were not available within the R/3 System, but were critical to [Menasha's] business." The ABAP programming team customized fields and reports within the R/3 System.

¶ 18. In total, more than 3,000 modifications were made to Menasha's R/3 System by the implementation and programming teams. Throughout, SAP representatives provided both off- and on-site technical and functional support to Menasha directly and through ICS. SAP also provided "patches" for the R/3 System to correct functional gaps. "Some of these patches included new source code written specifically for [Menasha's] system, to address the shortfalls of the R/3 System as it applied to [Menasha's] business."

¶ 19. Once customization was completed, Menasha worked with SAP and ICS to test the R/3 System to ensure it complied with Menasha's operations requirements. Testing lasted three to four months and included running real data through the system to determine whether it was operational in accordance with Menasha's required specifications. During testing, SAP, either directly or through ICS, provided off- and on-site technical support to Menasha and assisted in troubleshooting problems during testing.

¶ 20. After testing was complete, all relevant employees from all subsidiaries were required to attend two- to five-day classes provided by ICS and Menasha's information support staff. ICS and Menasha's information support staff prepared extensive written materials for training Menasha's employees. Information support staff was also required to attend additional training classes for maintaining and making modifications to trouble-shoot problems once the R/3 System was in use. SAP provided Menasha and ICS with extensive material for the running and maintenance of the R/3 System.

¶ 21. Once training was completed, Menasha began to switch to the new R/3 System. Because further customization for each subsidiary was required, Menasha elected to implement the R/3 System on a subsidiary-by-subsidiary basis. The implementation of the R/3 System took nearly seven years. SAP representatives and ICS provided support to Menasha and assisted in solving any operational problems that occurred. At least 23 different SAP consultants were involved in the on-site installation and implementation. Menasha continues to contact SAP on a weekly basis for assistance and support. In addition, SAP provides Menasha with upgrades, new releases, and patches to the R/3 System on at least a quarterly basis.

¶ 22. The installation and customization of the R/3 System cost more than $23 million of which $5.2 million was for the core R/3 System. To customize the system for Menasha's business, Menasha paid SAP $2.5 million, ICS approximately $13 million, and third-party consultants approximately $775,000.

¶ 23. In 1998, the DOR audited SAP. In that audit, the DOR determined that the R/3 System was noncustom and thus taxable. SAP did not dispute that

determination.[6] Separately, SAP and Menasha entered into an agreement whereby Menasha would pay $342,614.45 in sales tax for the R/3 System but that Menasha would dispute that payment and file a claim for a refund. The Commission found the following undisputed facts regarding that audit:

65. During 1998, [DOR] audited the American subsidiary of SAP for liability under Wisconsin's sales and use taxes for the period 1991 through 1997.

66. In the course of the audit, SAP and [DOR] agreed that SAP's sales of R/3 software in Wisconsin were subject to Wisconsin's sales tax as sales of noncustom software. [DOR] reached this determination for [reasons including R/3 sales being (1) "off-the-shelf" standardized software, i.e., written before the sale and intended for a wide variety of customers; (2) lack of pre-shipment modification to R/3 modules; (3) the delivery of existing R/3 software modules to all customers regardless of individual contracts; (4) SAP's delivery of "keys" to customers that would access particular modules delivered; (5) that development tools like ABAP/4 were only enhancements which did not change the R/3 source code; (6)-(7) that the implementation of

---

[6] While SAP agreed with the DOR—during the course of an audit—that the R/3 System was non-custom and thus subject to sales tax, the Commission found SAP's admission to be of "no value." The Commission concluded, "SAP is not a party to this proceeding, and, therefore, its admission is neither binding nor probative in this case. There may be any number of possible reasons why SAP elected to pay sales and use tax on its sale of the R/3 software, including reasons that may not reflect the merits of the issues raised in this case." We agree. SAP did not pay Menasha's taxes. SAP's agreement with the DOR has no precedential effect in this case. One's decision not to contest a matter is not binding on another who wishes to have its case heard and receive a full determination on the merits. Accordingly, we conclude that the Commission's conclusions were reasonable.

original base modules is a complex, lengthy process with many stages and processes; (8)-(9) that it is rare for customers to implement R/3 on their own, so customers have the option of hiring SPA [sic] consultants or logo partners to help with implementation; (10) that "SAP keeps the licensing and maintenance agreement separate for many contracts and/or agreements for consulting services;" (11) that SAP's transactions with Menasha were similar to other R/3 sales, "and in each case, SAP agreed that the sale was of noncustom software"; (12) that SAP's release of software upgrades, routine maintenance updates, and patches, are general in nature; and (13) changes to customer-specific functionality and user exit type programs are the customer's responsibility].

67. As a consequence of the agreement by SAP that sales of the R/3 program modules were taxable, SAP paid [DOR] more than $1.9 million in tax and interest for sales to Wisconsin customers and agreed to collect sales and use tax thereafter. This figure did not include sales to [Menasha because Menasha] provided SAP with a statement that [it] would directly pay the sales tax, which [it] did. . . .

*DOR v. Menasha Corp.*, 2007 WI App 20, ¶ 17, 299 Wis. 2d 348, 728 N.W.2d 738 (citing *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) ¶ 400–719, at 32,847–48 (WTAC 2003)).

## II. PROCEDURAL FACTS

¶ 24. Although the date is unknown from the record before us, Menasha initially paid sales and use tax for the R/3 System. However, on June 30, 1998, Menasha filed a refund claim with the DOR in the amount of $342,614.45 for the sales and use tax it had paid.[7] On

---

[7] This refund claim is based upon the tax that Menasha paid on the basic R/3 System that it purchased from SAP for $5.2 million.

April 28, 1999, the DOR denied Menasha's refund claim. Menasha then petitioned the DOR for a redetermination. On March 1, 2001, the DOR denied that request, and as a result, on April 27, 2002, Menasha requested that the Commission review the DOR's determination. Appearing before the Commission, both Menasha and the DOR filed separate motions for summary judgment. Accordingly, both parties submitted briefs, proposed findings of fact, affidavits, and exhibits. On December 1, 2003, the Commission granted Menasha's motion for summary judgment and denied the DOR's motion for summary judgment. The Commission, thereby, reversed the DOR's denial of Menasha's petition for redetermination and granted Menasha's refund claim. The Commission concluded that the R/3 System was custom and not subject to sales and use tax. The DOR then petitioned the Dane County Circuit Court for review pursuant to Wis. Stat. §§ 73.015(2), 227.52 and 227.53. Both parties again moved for summary judgment and submitted briefs, affidavits, and exhibits. The Dane County Circuit Court vacated the Commission's decision and reinstated the DOR's determination that the refund should be denied because the R/3 System was not custom. Menasha appealed the circuit court's decision. The court of appeals reversed the circuit court's decision and affirmed the Commission's decision, which granted Menasha a refund for sales and use tax paid on the R/3 System because it was custom.

A. Tax Appeals Commission's Decision

¶ 25. Menasha petitioned the Commission for review of the DOR's determination. The DOR had determined that the R/3 System was not custom and, there-

fore, it was subject to sales and use tax.[8] Both parties moved for summary judgment and submitted briefs, proposed findings of facts, affidavits, and exhibits. Thus, both parties, Menasha and the DOR, had the opportunity to present their respective arguments to the Commission. The Commission concluded that no genuine issues of material fact existed, and as a result, decided the matter at summary judgment. The Commission concluded that the R/3 System was "a custom program because of the significant investment [Menasha] made in presale consultation and analysis, testing, training, written documentation, enhancement, and maintenance support, and because it [was] not a pre-written program." As a result, it found the R/3 System exempt from sales and use tax. The Commission turned to the definition of "custom" in Wis. Admin. Code § Tax 11.71(1)(e). That definition instructs one to consider "all the facts and circumstances," and it recites seven factors to be considered. The Commission concluded that every factor need not be met for the program to be deemed custom, but rather, it determined that the factors in the rule are to be weighed along with all the other facts and circumstances.[9]

¶ 26. The Commission considered each factor. Under the first factor, regarding presale consultation, the Commission found the DOR had conceded that significant presale consultation and analysis occurred. Under the second factor, regarding loading and testing of the software, the Commission found that a former SAP employee loaded the software and thus, "[a]rguably, this

---

[8] The Commission's Practice and Procedures is *available at* http://www.wisbar.org/AM/Template.cfm?Section=Legal_Research&Template=/CM/ContentDisplay.cfm&ContentID=32054 (Last visited 07/01/08).

[9] *See* Wis. Admin. Code § Tax 11.71(1)(e).

part of the factor is a draw," but "the fact that a former SAP employee loaded the software weighs in favor of finding that the software at issue is custom software." Factor two also includes testing as a consideration and the Commission concluded that the testing—regardless of who conducted the testing—took three to four months, and thus, the second factor supported the conclusion that the software was custom.

¶ 27. Under the third factor, regarding training and written documentation, the Commission found that the DOR conceded that substantial training and written documentation was required. Under the fourth factor, regarding enhancement and maintenance support, the Commission found that the DOR conceded that the R/3 System needed enhancement and maintenance support. Under the fifth factor, regarding a rebuttable presumption that a program is not custom if it cost $10,000 or less, the Commission concluded that factor five did not apply because the cost greatly exceeded $10,000.

¶ 28. The Commission determined, with regard to factor six, that "[t]his case hinge[d] on whether the R/3 System [was] a prewritten program." "The other factors set forth in the rule either lead to a conclusion that the R/3 System is custom software or are neutral." The Commission concluded that the R/3 System was not a prewritten program under the rule's definition of "prewritten." Wisconsin Admin. Code § Tax 11.71(1)(k) states:

> "Prewritten programs", often referred to as "canned programs", *means programs prepared, held or existing for general use* normally for more than one customer, including programs developed for in-house use or custom program use which are subsequently held or offered for sale or lease.

(Emphasis added.)

602

¶ 29. The Commission utilized the rule's definition of "prewritten" and reasoned that the R/3 System was not prepared, held or existing for general use. The DOR urged the Commission to consider the dictionary definition of "prewritten," but the Commission rejected this argument because the definition of "prewritten" was provided by the rule.

¶ 30. The DOR also utilized "numerous descriptions of the R/3 System as providing standard solutions or being a standard package" (emphasis omitted). The Commission, however, concluded the DOR "appears to equate the rule's phrase 'general use' with standard. This misses the point." The Commission reasoned that "[t]he issue is not whether the end result is a program that provides standard business applications, but rather the obstacles one must overcome to get to apply the software." Thus, the Commission declined to construe the phrase "general use" with the word "standard" as the DOR repeatedly described the R/3 System as "providing standard solutions or being a standard package." "What matters[, the Commission concluded,] is the process by which the application is accomplished, regardless of whether the application is standard or not."

¶ 31. Under the DOR's analysis, the Commission stated, "a vendor could develop a software program completely from scratch . . . , and if the resulting program provided standard business applications, the software would not be custom software." This, however, the Commission concluded "does not make sense."

¶ 32. The Commission stated that "even the [DOR] concedes the following" facts:

1. The basic modules of the R/3 System must be subject to a certain degree of customization, and it

is only after this customization process is complete that the client has a usable software system;

2. As delivered, the R/3 System was inadequate for petitioner's use;

3. Members of petitioner's implementation team working with SAP and ICS Deloitte determined the operational and functional needs of each subsidiary in order to configure and customize the system;

4. The implementation team worked to configure and modify the R/3 System to adapt the system to each subsidiary's identified needs;

5. The implementation and ABAP programming teams worked to customize the R/3 System to meet petitioner's functional needs;

6. The ABAP programming teams created codes for hundreds of user exits to integrate external programs with the R/3 System, so that petitioner was able to realize the functionality needed for its unique business while preserving the functional efficiencies of the R/3 System;

7. The ABAP programming teams created new subsystems to run parallel to the R/3 System for operations not available within the R/3 System more critical to petitioner's business;

8. The ABAP programming teams customized fields and reports within the R/3 System to insure it produced output to be useful to petitioner's business;

9. SAP provided petitioner with patches to correct functional gaps identified during implementation, some of which included new source code written to address shortfalls of the R/3 System;

10. In total, more than 3,000 modifications were made to petitioner's R/3 System.

*Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) ¶ 400–719, at 32,855–56 (WTAC 2003).

¶ 33. Therefore, the Commission concluded, it took a significant amount of time, effort, and resources to make the R/3 System usable for Menasha. "The distinction between custom and prewritten programs hinges on the amount of effort necessary to get the software operational for the particular customer's needs." Because of the substantial amount of resources, time, and effort needed to make the R/3 System usable, the Commission stated, "we cannot conclude that the software at issue is prewritten." The Commission reasoned that if a program exists for general use, it will take little effort for it to be put in place for any user, whereas, if a program is useful only after a significant investment in "planning, testing, training, enhancement, and maintenance, then the software cannot be said to be prepared, held or existing for general use."

¶ 34. Under factor seven, regarding significant modification to an existing program, the Commission concluded that this factor did not apply in this case because the R/3 System was a custom program rather than an existing program. The Commission stated, "[t]his factor only makes sense in the overall scheme presented by [Wis. Admin. Code] section Tax 11.71(1)(e) if one concludes that 'existing program' means an 'existing program for general use' as that phrase is used in the definition of 'prewritten programs' in [Wis. Admin. Code] section Tax 11.71(1)(k)."

¶ 35. Finally, because all facts and circumstances must be considered, the Commission considered the cost of the software. It reasoned that because there is a presumption that anything under $10,000 is not custom, cost could be considered. The Commission con-

cluded that the significant cost, $5.2 million, favored a conclusion that the R/3 System was custom.

## B. Dane County Circuit Court's Decision[10]

¶ 36. The DOR petitioned the Dane County Circuit Court for review of the decision by the Commission, and both parties again filed cross-motions for summary judgment. "Because the [circuit] court [found] error by the commission, the court vacate[d] the commission's decision and reinstate[d] DOR's determination" that sales and use tax must be paid on the R/3 System. The circuit court concluded that the Commission erroneously interpreted and applied the law to the facts, "as those facts are set forth in the commission's ruling."

¶ 37. The circuit court applied a due weight deference standard to the Commission's interpretation and application of Wis. Admin. Code § Tax 11.71(1)(e).[11] Thus, the circuit court stated it would "uphold the commission's reasonable interpretation unless the [circuit] court deems another interpretation more reasonable." The circuit court concluded that due weight deference was appropriate because the Commission had not developed expertise that would necessarily place it in a better position than the court to make judgments about the administrative rule.

---

[10] While we review only the Commission's decision, we detail the circuit court's decision in the interest of completeness.

[11] The circuit court applied due weight deference to the Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e). However, when giving deference to the Commission's interpretation of a rule, the proper deference is either controlling weight deference or a de novo review. Due weight deference is relevant only for an agency's interpretation of a statute. *See* ¶¶ 58–60 for the appropriate deference regarding rule interpretation.

¶ 38. The circuit court also concluded that because the DOR, and not the Commission, promulgated the administrative rule, the DOR's interpretation should be afforded controlling weight deference because "[a]n administrative agency's interpretation of its own rule is controlling unless plainly erroneous or inconsistent with that rule." The circuit court, thus, disagreed with Menasha's argument that the Commission was under no obligation to give deference to the DOR's construction of Wis. Admin. Code § Tax 11.71(1)(e).

¶ 39. While the circuit court found no error with the Commission's interpretation of the rule's introduction, it disagreed with the Commission's interpretation and application of some factors. The circuit court concluded:

> The [circuit] court finds that [the R/3 System] was existing and prewritten when SAP sold it to Menasha because 1) while there may have been significant pre-sale consultation and analysis, and significant testing of the customized system, the fact that a *former* SAP employee installed it rather than SAP weighs in favor of deeming R/3 prewritten; 2) while DOR conceded the third, fourth, and fifth factors, R/3 fits the definition of a prewritten program because a) it was already prepared and available for general consumption prior to the sale thereof to Menasha, b) it was held by SAP to be licensed to thousands of world-wide customers as requested, and c) it was not written solely for Menasha upon Menasha's request therefore; and finally 3) given that R/3 was an existing program, the seventh factor does apply, and the facts as set forth by the commission do not show that *SAP* performed the significant modification of R/3 that was required to make it useful to Menasha.
>
> . . . .

. . . Where the software selected for purchase is an already existing program available for general use, significant modification must be made by the vendor for the software to be deemed custom. Thus, Menasha's purchase of R/3 did not involve the purchase of custom software. . . .

## C. Court of Appeals' Decision

¶ 40. Menasha appealed the circuit court's decision, and the court of appeals concluded that the program was custom under Wis. Admin. Code § Tax 11.71(1)(e). Citing to *Caterpillar*,[12] the court of appeals stated, " '[b]ecause the commission is the final administrative authority that reviews the decisions of the DOR, any deference that might be due to the decision of an administrative agency is due to the commission, not to the DOR.' " *Menasha*, 299 Wis. 2d 348, ¶ 23 (citing *Caterpillar*, 241 Wis. 2d 282, ¶ 6 n.3).

[B]oth Wis. Stat. § 73.01(4) and the [] case law plainly establish that the commission is the final authority on all the facts and questions of law regarding the tax code; the DOR is not. Any deference due to an administrative agency's decision in this context is given to the commission, not the DOR. Our deference is based on the commission's extensive expertise achieved by discharging its legislative duty as the final authority on the facts and questions of law in resolving tax disputes. . . .

*Menasha*, 299 Wis. 2d 348, ¶ 24.

¶ 41. The court of appeals concluded that the Commission's decision was entitled to due weight deference. It stated:

---

[12] *DOR v. Caterpillar, Inc.*, 2001 WI App 35, 241 Wis. 2d 282, 625 N.W.2d 338.

> In addition to being designated the final authority on all questions of law involving taxes, the commission has generated and employed its substantial experience discharging its duty in construing the rules governing the taxability of tangible property since Wis. Stat. § 77.51(20) was enacted.

*Id.*, ¶ 29.

¶ 42. Applying the due weight deference standard, the court of appeals concluded that the Commission's interpretation was reasonable and consistent with the plain language of the rule, and the DOR failed to offer a more reasonable interpretation of the rule.[13] The court of appeals reasoned that the DOR "appears to ignore the first five factors" of the rule and instead focuses solely on factors six and seven. The DOR argued that factors six and seven "are mandatory and provide no exceptions, and therefore, [they] trump the other factors set forth in [Wis. Admin. Code] § Tax 11.71(1)(e)1–5." However, the court of appeals, citing to the Commission, concluded that "all the facts and circumstances" must be considered under Wis. Admin. Code § Tax 11.71(1)(e). "Aside from its narrow and unreasonable interpretation of [the rule], the DOR offers no reason for why [one] should ignore the commission's determi-

---

[13] While the court of appeals' decision stated that it applied the due weight deference standard to the rule interpretation, in reality it applied controlling weight deference. Due weight deference applies to statutory interpretation. Under rule interpretation, deference is either controlling weight deference or it is a de novo review. The court of appeals did apply the correct standard given that it concluded that the Commission's interpretation was reasonable and consistent with the plain language of the rule. *See* ¶¶ 58–60 for the appropriate deference regarding rule interpretation.

nation that the tax rule shall be considered in its entirety in determining whether a computer program is customized." *Id.*, ¶ 49.

¶ 43. The court of appeals concluded:

> We agree with the commission's conclusion that § Tax 11.71(1)(e)6. should not be considered in isolation of the other factors in the rule. When the factors are read together, the most reasonable construction of the rule is that the definitions of "custom" and "prewritten" software in § Tax 11.71[(1)](e) and (k) are informed in large part by consideration of the first five factors of § Tax 11.71(1)(e). The commission reasonably concluded that the more effort required making the software usable, the more likely it is custom software. This conclusion is consistent with the plain language of the rule. . . .

*Id.*, ¶ 58.

### III. STANDARD OF REVIEW

¶ 44. This case requires interpretation of both Wis. Stat. § 77.51(20) and Wis. Admin. Code § Tax 11.71(1)(e). The application of a statute and application of an administrative rule to undisputed facts are questions of law that we review de novo. *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶ 10, 299 Wis. 2d 1, 727 N.W.2d 311; *see also Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 18, 290 Wis. 2d 421, 714 N.W.2d 130.

¶ 45. "[W]hen interpreting administrative regulations, we use the same rules of interpretation as we apply to statutes." *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 10. "Interpretations of code provisions, and the determination as to whether the provision in question is consistent with the applicable statute, are subject to

principles of statutory construction." *Orion Flight*, 290 Wis. 2d 421, ¶ 18 (citations omitted). " 'If a rule is ambiguous, we may resort to extrinsic aids to determine agency intent.' " *Id.* (citation omitted). "In resolving the ambiguity, this court gives deference to an agency's settled 'interpretation and application of its own administrative regulations unless the interpretation is inconsistent with the language of the regulation or is clearly erroneous.' " *Id.* (citations omitted). "When an administrative agency promulgates regulations pursuant to a power delegated by the legislature, we construe those regulations 'together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.' " *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 10 (citation omitted).

¶ 46. In a case such as this, we review the Commission's decision rather than the decision of the circuit court. *Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals*, 2006 WI 86, ¶ 8 n.4, 292 Wis. 2d 549, 717 N.W.2d 184; *DOR v. Caterpillar, Inc.*, 2001 WI App 35, ¶ 6, 241 Wis. 2d 282, 625 N.W.2d 338. While we are not bound by an agency's—like the Commission's—conclusions of law, we may defer to the Commission's legal conclusions. *Id.* The specific characterization of deference given to an agency is dependent upon whether the agency is interpreting a statute or a regulation. *See DaimlerChrysler*, 299 Wis. 2d 1, ¶¶ 13–18.[14]

---

[14] In *Racine Harley-Davidson*, we stated:

By granting deference to agency interpretations, the court has not abdicated, and should not abdicate, its authority and responsibility to interpret statutes and decide questions of law. Some cases, however, mistakenly fail to state, before launching into a discussion of the levels of deference, that the interpretation and application of a statute is a question of law to be determined

## A. Deference to the Commission's Interpretation of the Statute

¶ 47. This court has articulated three possible levels of deference for an agency's interpretation of a statute: great weight, due weight, and no deference. *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 12; *DOR v. River City Refuse Removal, Inc.*, 2007 WI 27, ¶¶ 32–35, 299 Wis. 2d 561, 729 N.W.2d 396.

¶ 48. Great weight deference is given to the agency's statutory interpretation when each of the following requirements are met: (1) the agency is charged by the legislature with the duty of administering the statute; (2) the agency interpretation is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 16. When great weight deference is appropriate, a reviewing court should sustain the agency's reasonable statutory interpretation even if the court concludes that another interpretation is equally reasonable, or even more reasonable, than the agency's interpretation. *Id.*, ¶ 17.

---

by a court. In any event, it is the court's responsibility to decide questions of law and determine whether deference is due and what level of deference is due to an agency interpretation and application of a statute. The court determines the appropriate level of deference by comparing the institutional qualifications and capabilities of the court and the agency by considering, for example, whether the legislature has charged the agency with administration of the statute, whether the agency has expertise, whether the agency interpretation is one of long standing, and whether the agency interpretation will provide uniformity and consistency.

*Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals*, 2006 WI 86, ¶ 14, 292 Wis. 2d 549, 717 N.W.2d 184.

¶ 49. Due weight deference is given to the agency's statutory interpretation when the agency has some experience in an area but has not developed the expertise that necessarily places it in a better position than a court to make judgments regarding the interpretation of the statute. *Id.*, ¶ 18. "Due weight deference is based on the fact that the legislature has charged the agency with the enforcement of the statute in question, not on the expertise of the agency." *Id.* When this court applies due weight deference, it will sustain an agency's statutory interpretation if the interpretation is not contrary to the plain meaning of the statute, and the court does not determine that a more reasonable interpretation exists. *Id.*

¶ 50. No deference is given to the agency's statutory interpretation when the issue is one of first impression, the agency has no experience or expertise in deciding the legal issue presented, or the agency's position on the issue has been so inconsistent as to provide no real guidance. *Id.*, ¶ 19.

¶ 51. In the case at hand, we afford the Commission due weight deference on its statutory interpretation of Wis. Stat. § 77.51(20). The legislature designated the Commission as the final authority on all questions of law and fact arising under the tax statutes —although, the Commission's decision is still subject to judicial review. Wis. Stat. § 73.01(4). Additionally, the Commission has experience interpreting and applying Wis. Stat. § 77.51(20). *All City Commc'n Co., Inc. v. DOR*, 2003 WI App 77, ¶ 11, 263 Wis. 2d 394, 661 N.W.2d 845 (stating that "the commission has experience determining whether property is [tangible] per-

sonal property for purposes of imposing sales and use taxes"); *Menasha*, 299 Wis. 2d 348, ¶ 29 (citing to other Wisconsin court decisions and stating that "the commission has generated and employed its substantial experience discharging its duty in construing the rules governing the taxability of tangible property since Wis. Stat. § 77.51(20) was enacted. *See, e.g., DOR v. River City Refuse Removal, Inc.*, 2006 WI App 34, ¶¶ 12, 14, 289 Wis. 2d 628, 712 N.W.2d 351, *review granted*, 2006 WI 108, 292 Wis. 2d 409, 718 N.W.2d 723 (No. 2004AP2468); *All City Commc'n Co. v. DOR*, 2003 WI App 77, ¶¶ 6, 11, 263 Wis. 2d 394, 661 N.W.2d 845").

¶ 52. While we afford the Commission due weight deference on its interpretation of the statute, this case centers on the Commission's interpretation of the regulation or rule, Wis. Admin. Code § Tax 11.71(1)(e). The statute in question defines tangible—and thus taxable—personal property as including "computer programs except *custom* computer programs." Wis. Stat. § 77.51(20) (emphasis added). The statute, however, does not define "custom programs"; rather, the regulation defines the phrase "custom programs." As a result, the statutory interpretation is dependent upon the interpretation of the regulation. Thus, while we have articulated the proper standard for reviewing the statute in this case, the statute is attenuated as to the issue before this court because it is the Commission's interpretation of the rule, Wis. Admin. Code § Tax 11.71(1)(e), that is at issue.

B. Deference to Commission's Interpretation of the Regulation

¶ 53. "An administrative agency's interpretation of its own rules or regulations is controlling unless 'plainly erroneous or inconsistent with the regula-

tions.' " *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 11. However, in this case, as in *DaimlerChrysler*, the adjudicative body did not promulgate the rule, i.e., in this case the Commission did not promulgate the rule. *See, e.g., id.* Rather, the rule was promulgated by the DOR. However, if the Commission reasonably interpreted the rule, the interpretation was not inconsistent with the language of the rule or clearly erroneous, and the Commission was charged with being the final authority on the rule at issue, we must afford the Commission controlling weight deference. *See id.*, ¶ 13 (affording the Labor and Industry Review Commission (LIRC) controlling weight deference when interpreting the Department of Workforce Development's (DWD) rule).

¶ 54. When applying controlling weight deference, we ask "whether the agency's interpretation is reasonable and consistent with the meaning or purpose of the regulation." *Id.*, ¶ 19. Despite the different terminology, "controlling weight deference is similar to great weight deference," the latter associated with deference given to an agency when interpreting a statute as opposed to a rule interpretation. *Id.* Thus, we may consider that standard's language; as such, under controlling weight deference, a court should "refrain from substituting its view of the law for that of an agency charged with administration of the law, and will sustain the agency's conclusions of the law if they are reasonable." *Id.*, ¶ 16. "We will sustain an agency's conclusions of law even if an alternative view of the law is just as reasonable or even more reasonable." *Id.* Accordingly, if the Commission's interpretation is reasonable and consistent with the meaning or purpose of the rule, then we uphold the Commission's decision rather than substitute our judgment for that of the Commission's.

¶ 55. Because the legislature has subjected the Commission's decision to judicial review, it is the Commission's decision, rather than the DOR's decision, to which we must give deference. *Kamps v. DOR*, 2003 WI App 106, ¶ 26, 264 Wis. 2d 794, 663 N.W.2d 306; *see also* Wis. Stat. § 73.015(2); Wis. Stat. § 227.57. Even if disagreement between the Commission and the DOR arises over the rule's meaning, courts give deference to the Commission rather than the DOR. *See, e.g., Caterpillar*, 241 Wis. 2d 282, ¶ 6 n.3 (stating that when there is a conflict between the DOR and the Commission, any deference that might be due is given to the Commission because it is the final administrative authority that reviews the DOR's decisions); *River City Refuse Removal*, 299 Wis. 2d 561, ¶ 59 (concluding that deference should be given to the Commission; the DOR's interpretation was not more reasonable than the Commission's).[15]

¶ 56. While the DOR concedes that courts must review the Commission's decision and not the DOR's decision, it argues that the Commission should at least give deference to or address the DOR's construction of its rule. Because the Commission did not defer or specifically refer to the DOR's construction, the DOR argues that this court should conduct a de novo review of the Commission's rule interpretation. We decline that request.

---

[15] While *Caterpillar* and *River City Refuse Removal* involve the interpretation of a statute and not a rule, the Commission is still the final authority on all tax questions in the state of Wisconsin. *See* Wis. Stat. § 73.01(4). Thus, even when disputes arise, we must still defer to the Commission's decision if deference is to be given.

¶ 57. The DOR asserts several arguments in favor of its conclusion that the Commission must give deference to the DOR. While we address those specific arguments below, in short, the DOR fails to articulate any reason that persuades us to conclude that the Commission must defer to the DOR's interpretation of its rule.

¶ 58. The legislature designated the Commission as the final authority on all tax questions. Requiring the Commission to grant deference to the DOR would undermine the Commission's authority to review tax questions. By virtue of creating the Commission and identifying it as the agency charged with interpreting questions that arise under our tax code, the legislature has divided the agencies' duties with regard to the tax code. The DOR may promulgate rules and even issue private letter rulings or interpretations that give guidance to taxpayers, but the Commission is the final authority. Thus, it is for the Commission to interpret those rules. The legislature has designated the Commission, not the DOR, as the final authority on all tax questions. It is within the province of the legislature to enact the law.

¶ 59. Requiring the Commission to give deference to the DOR not only undermines the Commission's authority, it is troubling for the taxpayer who appeals the DOR's decision. The Commission hears and decides disputes between the DOR and individual taxpayers or entities. If the Commission, which serves a quasi-judicial function, must defer to one party—namely, the DOR—how does the taxpayer receive a fair hearing? The taxpayer brings his or her appeal to the Commission at a significant disadvantage if the Commission must defer to the taxpayer's opponent, the DOR.

¶ 60. While the Commission may find it useful to consider the DOR's construction of its rule by reviewing such things as published tax releases, technical information memorandums, and private letter rulings, it need not ultimately "defer" to the DOR's interpretation, nor must it specifically refer to the DOR's construction in its decision. In this case, while the Commission did not specifically refer by name to the DOR's published tax releases, technical information memorandums, and private letter rulings, these materials were submitted to the Commission. Moreover, the DOR submitted briefs, proposed findings of fact, affidavits, and exhibits. The Commission states in its written decision that "[b]ased upon the submissions of the parties and the entire record in this matter, the Commission hereby rules and orders as follows[]." Therefore, the Commission did consider the DOR's submissions since the DOR was a party.

¶ 61. No authority exists for requiring the Commission to defer to the DOR's construction of its rule. The legislature does not mandate such a requirement, and we decline the opportunity to create one. The DOR's deference argument is intriguing because the DOR promulgated this rule, and thus, it is, at least arguably, reasonable to argue that the Commission should give the DOR deference. However, this would ignore the boundaries that the legislature created when it gave the Commission final authority over all tax questions.

¶ 62. The DOR, citing to *Hillhaven*,[16] argues that an agency's interpretation of its own rule is controlling unless plainly erroneous or inconsistent with the rule's

---

[16] *Hillhaven Corp. v. DHFS*, 2000 WI App 20, ¶ 12, 232 Wis. 2d 400, 606 N.W.2d 572.

language. Thus, according to the DOR, the Commission should afford the DOR deference because the DOR promulgated the rule at issue. As a general rule, that is correct. However, the DOR fails to acknowledge a critical difference between this case and *Hillhaven*. In *Hillhaven*, no adjudicative agency body was charged with reviewing the Department of Health and Family Services' decision. The department's decision was appealed directly to the circuit court. In the case at issue, the Commission reviews the DOR's decisions, and *it is the Commission's decision*, not the DOR's, that is appealed to the circuit court. It is significant that the legislature, in this case, designated an "intermediary"— the Commission—to review the DOR's decision and to be the final authority on tax questions. Again, it is the Commission's decision that is subject to judicial review and to which we must give deference, if deference is to be given.

¶ 63. The DOR, citing to *Griffin*,[17] argues that the goal when interpreting a rule is to discern the intent of the rule maker. Presumably, the DOR is arguing that the Commission must defer to the DOR's construction in an effort to discern the intent of the rule maker. However, the meaning of the rule may also be discerned from the rule's language. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. The Commission's decision relies heavily on the rule's language. The DOR had an opportunity to express the rule's meaning when it drafted the rule. We say this not to discourage the production of private letter rulings or other guiding documents, which greatly assist the pub-

---

[17] *State ex rel. Griffin v. Smith*, 2004 WI 36, ¶ 19, 270 Wis. 2d 235, 677 N.W.2d 259.

lic in interpreting tax rules, but to simply state that the meaning of the rule can be expressed in the rule's language. Here, the Commission reasonably relied on the rule's language to discern its meaning.

¶ 64. The DOR also relies on *Griffin* to further argue that by declining to require the Commission to give deference to the DOR, the Commission is given more power than Wisconsin courts because courts must defer to an agency's interpretation of its rule unless the agency's interpretation is plainly erroneous or inconsistent with the regulations. Courts give deference to an agency, either a line agency or an adjudicative agency, because the agency is in a better position to interpret the rule than the court; the agency has significant and continual experience with the area of law in question.[18]

¶ 65. However, when, as in this case, the Commission reviews the DOR's decision, the Commission need not rely on the DOR's expertise because the Commission itself is experienced with interpreting and applying the tax code, and is, in fact, the final authority on all tax questions. *See DOR v. Heritage Mut. Ins. Co.*, 208 Wis. 2d 582, 589, 561 N.W.2d 344 (Ct. App. 1997) (stating that the Commission possesses expertise and experience in construing the tax laws generally). The Commission has extensive experience with interpreting

---

[18] *See, e.g.*, Salvatore Massa, *The Standards of Review for Agency Interpretations of Statutes in Wisconsin*, 83 Marq. L. Rev. 597, 599 (2000) (stating "[I]nstitutions, courts and agencies each have strengths and weaknesses which may place one institution in a better position to resolve a particular case. An agency has significant and constant oversight of a body of regulatory law that a court lacks."); *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶¶ 13–14 (stating that "levels of deference take into account the comparative institutional qualifications and capabilities of the court and the administrative agency").

and applying this state's tax laws. As a result, it need not rely on the DOR for assistance, although it certainly may consider the DOR's publications, which articulate the DOR's interpretation of a rule. Therefore, it is not that the Commission has more power than a court, but rather, it is that, unlike the courts, the Commission is better suited and less likely to need assistance with interpreting and applying the tax rules that it is charged with interpreting and applying.

¶ 66. The DOR, citing to *Pfeiffer*,[19] argues that because it "performed all of the[] legislative functions, it necessarily 'knows the specific purposes of the regulations it has promulgated' and 'is in the best position to interpret its own regulations in accordance with their underlying purposes.' " However, *Pfeiffer* and other cases cited by the DOR do not consider how the quasi-judicial function of the Commission alters this analysis. While it remains true that the agency that promulgates the rule should be given controlling weight deference, this is altered here because the legislature designated an agency, the Commission, with the task of reviewing decisions and being the final authority. In *Daimler-Chrysler*, we stated that "[a]n administrative agency that regularly works with the rules and regulations of another agency, whose actions it is authorized by the legislature to review, is in the best position to interpret such rules and regulations because the agency knows the specific purposes of the rules and regulations that have been promulgated, and has expertise in the area the agency is called upon to review." *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 22.

---

[19] *Pfeiffer v. Bd. of Regents of Univ. of Wisconsin Sys.*, 110 Wis. 2d 146, 155, 328 N.W.2d 279 (1983).

¶ 67. The DOR argues that "[n]owhere does *DaimlerChrysler* state that LIRC would have reasonably interpreted DWD's rule if LIRC had either failed to accord controlling weight to DWD's construction of DWD's own rule or had failed to address DWD's prior official constructions of its rule. . . ." However, nowhere in *DaimlerChrysler* does the court suggest that giving deference to or addressing the DWD's construction was critical to its conclusion that the LIRC reasonably interpreted the regulation in question. In fact, the LIRC's interpretation was afforded controlling weight deference "because the LIRC reasonably interpreted a rule adopted by the DWD, the LIRC's interpretation was not inconsistent with the language of the rule or clearly erroneous, and the LIRC was charged by the legislature with the duty of reviewing decisions . . . of the DWD, and does so frequently." *Id.*, ¶ 13.

¶ 68. The DOR, citing to *River City Refuse Removal*,[20] argues that the Commission should not have been afforded any deference because it had not issued prior decisions construing the substantive provisions of the DOR's rule. However, in so arguing, the DOR utilizes the standards of review for statutory interpretation instead of rule interpretation. While this argument may apply to statutes, as articulated in *River City Refuse Removal*, it does not necessarily follow that it applies to interpretation of rules. No deference is due when an agency's *statutory interpretation* is one of first impression. *River City Refuse Removal*, 299 Wis. 2d 561, ¶ 35 (emphasis added). However, the case at hand is based upon a rule interpretation rather than a statutory interpretation.

---

[20] *DOR v. River City Refuse Removal, Inc.*, 2007 WI 27, ¶ 35, 299 Wis. 2d 561, 729 N.W.2d 396.

¶ 69. In any event, the Commission does have some experience with the factors articulated in Wis. Admin. Code § Tax 11.71(1)(e). *See, e.g., IBM Corp. v. DOR*, Wis. Tax Reptr. (CCH) ¶ 202–854 (WTAC 1987); *Health Micro Data Sys., Inc. v. DOR*, Wis. Tax Reptr. (CCH) ¶ 203–062 (WTAC 1989). While, in these cases, the Commission did not "apply" the Wis. Admin. Code § Tax 11.71(1)(e) and (k) factors as it did in this present case, the decisions do reference the factors and do consider, at the very least, the ideals contained within the formalized factors. Thus, the DOR seems to overstate the Commission's inexperience and does not acknowledge the Commission's general experience with interpreting and applying the tax statutes and rules. *See Heritage*, 208 Wis. 2d at 589; *see also Telemark Dev., Inc. v. DOR*, 218 Wis. 2d 809, 820, 581 N.W.2d 585 (Ct. App. 1998) (stating that deference is not dependent on whether a specific factual scenario has been heard but rather on the Commission's experience with the statutory scheme). In this case, it is not as though the Commission never saw these particular factors until it was called upon to decide this case. After all, these factors have been in existence since 1985.

¶ 70. Finally, the DOR argues that the acquiescence and nonacquiescence provisions of Wis. Stat. §§ 73.01(4)(e)[21] and

---

[21] Wisconsin Stat. § 73.01(4)(e) provides in relevant part:

The decision or order of the commission shall become final and shall be binding upon the petitioner and upon the department of revenue for that case unless an appeal is taken from the decision or order of the commission under s. 73.015. Except in respect to small claims decisions, if the commission construes a statute adversely to the contention of the department of revenue:

1. Except for hearings on ss. 341.405 and 341.45 and except as provided in subd. 2., the department of revenue shall be deemed to acquiesce in the construction so adopted unless the department of

73.015(2)[22] apply to the case at hand.[23] In short, the DOR argues that when the DOR does not petition for judicial review and does not file a notice of nonacquiescence after the Commission's decision, the DOR has determined that the Commission has correctly construed the statutes or rules at issue. On the other hand, the DOR argues that when it petitions' for judicial review or files a notice of nonacquiescence, the DOR has determined that the Commission has incorrectly construed the statutes or rules at issue. As a result, the DOR argues that in such cases, the Commission's decision should be subject to de novo review.

¶ 71. We, however, are persuaded by Menasha's argument that the acquiescence and nonacquiescence

---

revenue seeks review of the order or decision of the commission so construing the statute. For purposes of this subdivision, the department of revenue has sought review of the order or decision if it seeks review and later settles the case or withdraws its petition for review or if the merits of the case are for other reasons not determined by judicial review. The construction so acquiesced in shall thereafter be followed by the department of revenue.

[22] Wisconsin Stat. § 73.015(2) provides:

Any adverse determination of the tax appeals commission is subject to review in the manner provided in ch. 227. If the circuit court construes a statute adversely to the contention of the department of revenue, the department shall be deemed to acquiesce in the construction so adopted unless an appeal to the court of appeals is taken, and the construction so acquiesced in shall thereafter be followed by the department.

[23] The DOR's arguments are in response to an order this court issued on March 21, 2008, asking the parties to discuss, "[w]hat impact, if any, do the acquiescence and non-acquiescence provisions of Wis. Stat. §§ 73.01(4)(e)1 and 73.015(2) (2003–04) have on the standard of review and degree of deference to be accorded the Department of Revenue and Tax Appeals Commission in the instant matter?"

provisions of Wis. Stat. §§ 73.01(4)(e) and 73.015(2) do not apply to the case at bar. The acquiescence rules, in general, expand the binding effect of the Commission's decision. While the Commission's decision is always binding on the parties of a particular dispute, the Commission's decision binds the DOR on other potential disputes only if the DOR does not appeal or file a notice of nonacquiescence. The acquiescence rules ensure stability in tax matters because they allow taxpayers to rely on the Commission's decisions and interpretations unless notice to the contrary is given—by appeal or nonacquiescence—that the DOR does not intend to follow the Commission's interpretations in subsequent taxpayer disputes. *See DOR v. U.S. Shoe Corp.*, 158 Wis. 2d 123, 136–37, 462 N.W.2d 233 (Ct. App. 1990). If no appeal or notice of nonacquiescence is filed, then the DOR is estopped from re-litigating the Commission's interpretation when the same issue arises with another taxpayer. In the case at hand, the acquiescence rules do not apply because here we are reviewing the Commission's decision. We are procedurally beyond the point where acquiescence or nonacquiescence has any relevance. The acquiescence and nonacquiescence provisions simply cannot be read to require a de novo review of the Commission's decision. They have no relationship to the standard of review.

¶ 72. Accordingly, we give the Commission's statutory interpretation due weight deference, and we give the Commission's rule interpretation controlling weight deference. While the statute uses the word "custom," that word is defined only by the rule. Therefore, it is the rule interpretation that controls in this case. Under controlling weight deference, we ask whether the agency's interpretation is reasonable and consistent with the meaning or purpose of the regula-

tion. If the Commission's interpretation is reasonable and consistent with the meaning or purpose of the rule, then we uphold the Commission's decision rather than substitute our judgment for that of the Commission's.

## IV. APPLICATION OF WIS. ADMIN. CODE § TAX 11.71(1)(e) TO THE R/3 SYSTEM

¶ 73. Tangible personal property is subject to Wisconsin sales and use tax. Wis. Stat. §§ 77.51(20), 77.52(1), 77.53(1). " 'Tangible personal property' means all tangible personal property of every kind and description and includes . . . computer programs except custom computer programs." Wis. Stat. § 77.51(20). "Custom programs" is defined in Wis. Admin. Code § Tax 11.71(1)(e). It provides:

> "Custom programs" mean utility and application software which accommodate the special processing needs of the customer. The determination of whether a program is a custom program *shall be based upon all the facts and circumstances*, including the following:
>
> 1. The extent to which the vendor or independent consultant engages in significant presale consultation and analysis of the user's requirements and system.
>
> 2. Whether the program is loaded into the customer's computer by the vendor and the extent to which the installed program must be tested against the program's specifications.
>
> 3. The extent to which the use of the software requires substantial training of the customer's personnel and substantial written documentation.
>
> 4. The extent to which the enhancement and maintenance support by the vendor is needed for continued usefulness.

5. There is a rebuttable presumption that any program with a cost of $10,000 or less is not a custom program.

6. Custom programs do not include basic operational programs or prewritten programs.

7. If an existing program is selected for modification, there must be a significant modification of that program by the vendor so that it may be used in the customer's specific hardware and software environment.

Wis. Admin. Code § Tax 11.71(1)(e) (emphasis added).

¶ 74. The Commission concluded that Wis. Admin. Code § Tax 11.71(1)(e) instructs one to consider "all the facts and circumstances," including the seven factors listed in the rule. The factors, the Commission concluded, are not elements that must be met for a program to be deemed custom, but rather, the factors in the rule are to be weighed along with the other facts and circumstances. As a result, when considering all seven factors and all the facts and circumstances, the Commission concluded that the R/3 System was "a custom program" because of the significant investment Menasha made in "presale consultation and analysis, testing, training, written documentation, enhancement, and maintenance and support, and because [the R/3 System] is not a prewritten program."

¶ 75. The DOR disagrees with the Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e). It argues that the R/3 System "was an existing set of prewritten, pre-engineered noncustom program modules" that was in general use in 1995. Thus, under the mandatory language of factor six of § Tax 11.71(1)(e), the R/3 System is prewritten and thus not custom. The

DOR further argues that factor seven cannot be ignored because it contains mandatory language regarding existing programs. Therefore, the DOR argues that, under factor seven, the R/3 System was an existing program that SAP did not modify for Menasha prior to or even subsequent to delivering the R/3 System. Menasha, on the other hand, argues that the Commission's consideration of "all the facts and circumstances" was appropriate, and the DOR's interpretation excludes factors one through five from consideration.

¶ 76. Under the standard of review governing this case, we conclude that the Commission's interpretation is reasonable and consistent with the rule's language and the purpose of the regulation. The rule is instructive; a determination of whether a program is custom "shall be based upon all the facts and circumstances including" the seven factors listed in the rule. Because all the facts and circumstances must be considered, the factors are not elements to be satisfied but are factors that should be weighed along with all the facts and circumstances. Under the standard of review, we must now turn to the Commission's consideration of the seven factors and all the facts and circumstances.

¶ 77. Under the first factor, regarding presale consultation, the Commission concluded that the DOR conceded that significant presale consultation and analysis had occurred. Presale consultation began in 1993 with the analysis of Menasha's then current software, continued through 1995 when Menasha began discussions with SAP in April, and purchasing the license for the R/3 System in September of 1995. Presale consultation with SAP included SAP evaluating and collecting data from Menasha and SAP performing

a sample demonstration for Menasha. Thus, factor one weighs in favor of the R/3 System being a custom program.

¶ 78. Under the second factor, regarding loading and testing of the R/3 System, the Commission concluded that even though the vendor did not load the software, a former SAP employee, who was retained by Menasha specifically for providing support during the installation, loaded the software. As a result, the Commission concluded that this weighs in favor of the software being custom. While we acknowledge that the rule's language in factor two specifically refers to whether the vendor loaded the software, it was reasonable—even if it is not conclusive—for the Commission to consider under all the facts and circumstances that a former SAP employee installed the software.

¶ 79. The second factor also requires consideration of whether the newly installed program must be tested against the program's specifications. The Commission concluded that the DOR conceded that after installation and customization was complete, the R/3 System was tested for three to four months. As a result, the Commission reasonably concluded that factor two weighs in favor of the R/3 System being a custom program.

¶ 80. Under the third factor, regarding whether substantial training and written documentation was required to use the software, the Commission concluded that the DOR conceded that substantial training and written documentation was needed. All employees were required to attend two- to five-day classes. Extensive written materials were prepared by ICS and Menasha's support staff. Additionally, Menasha's information support staff attended additional training fo-

cused on *maintaining, modifying, and trouble-shooting* problems once the R/3 System was in use. Thus, the Commission reasonably concluded that factor three weighs in favor of the R/3 System being a custom program.

¶ 81. Under factor four, regarding the extent to which the software requires enhancement and maintenance support by the vendor, the Commission concluded and the DOR conceded that the R/3 System needed enhancement and maintenance support. Menasha continues to contact SAP on a weekly basis for assistance and support. In addition, SAP provides Menasha with upgrades, new releases, and patches to the R/3 System on at least a quarterly basis. Thus, the Commission reasonably concluded that factor four weighs in favor of the R/3 System being a custom program.

¶ 82. Under factor five, regarding a rebuttable presumption that any program is not custom if it costs $10,000 or less, the Commission concluded this factor did not apply because the cost greatly exceeded $10,000. However, after its discussion of the seven factors, the Commission did consider the cost of the R/3 System when considering "all the facts and circumstances." In a footnote, the court of appeals' opinion expressed concern because no other portion of the rule indicates that cost of the program should be a factor in determining whether a computer program is a custom program. It, however, makes sense that cost can be evaluated when considering all the facts and circumstances. As addressed in factor five, cost is a factor, but not determinative. The Commission concluded that factor five should not apply in this case because "the R/3 System greatly exceeded [the] threshold" of $10,000 or less, but it reasonably concluded that cost could be considered

630

when evaluating all the facts and circumstances. In the end, the Commission reasonably considered cost.

¶ 83. The DOR's argument relies on factors six and seven. In fact, the DOR not only argues that these two factors weigh in its favor, but it argues that these factors contain mandatory language that could render a program non-custom regardless of the other factors. Under factor six, regarding basic operational or pre-written programs not being custom, the Commission concluded that the R/3 System was not a prewritten program. "Prewritten" is defined as:

> "Prewritten programs", often referred to as "canned programs", means programs prepared, held or existing for general use normally for more than one customer, including programs developed for in-house use or custom program use which are subsequently held or offered for sale or lease.

Wis. Admin. Code § Tax 11.71(1)(k).

¶ 84. The Commission concluded that "[t]he distinction between custom and prewritten programs hinges on the amount of effort necessary to get the software operational for a particular customer's needs." Because of the substantial amount of resources, time, and effort needed to make the R/3 System usable, the Commission stated it could not conclude that the R/3 System was prewritten. A prewritten program would "require relatively little effort to be put in place for any user."

¶ 85. The Commission's conclusions based upon factor six and Wis. Admin. Code § Tax 11.71(1)(k), which defines "prewritten programs," are reasonable and consistent with the rule's language. The Commis-

sion reasoned that the first four factors "hinge[] on the degree to which the software is ready for use off-the-shelf," and as a result, this supported the Commission's distinction between prewritten and custom as determined by the amount of effort needed to bring software online for a particular customer.[24] The DOR takes issue with the Commission's reasoning and argues that factor six contains mandatory language that if a program is prewritten then it is not custom regardless of the effort required to make it usable.

¶ 86. We conclude that the Commission's overall conclusions regarding factor six are reasonable. We agree that the R/3 System was not a prewritten program. A program is prewritten and thus perhaps not custom if the program is "prepared, held or existing for general use." In other words, a prewritten program is ready to be used by those who purchase it. Thus, this factor "hinges" on whether a program is available for general use right off-the-shelf. While the purchaser of a prewritten program may make some minor changes in an effort to make it more efficient or to simply set it up, a prewritten program does not require significant modi-

---

[24] While factors one and two may hinge on the degree to which the software is ready to go off-the-shelf, that reasoning does not follow with factors three and four. In consideration of factor three, a very complicated non-custom program that is ready to go off-the-shelf may require substantial training even though it is ready for use. In consideration of factor four, whether programs need enhancement and maintenance has little to do with whether a program is ready for use directly off-the-shelf. While the Commission's language is somewhat perplexing, its reasoning is sound. In short, the Commission reasonably states that the more effort it takes to make a program usable, the more likely—even if not necessarily dispositive—that the program is custom, rather than canned or prewritten.

fications in order for one to make any use out of the program. In this case, the DOR concedes that the R/3 System must be subjected to a certain degree of customization before it is even usable by a client and it concedes that the implementation teams worked to identify and meet the specific needs of each subsidiary, which included:

- Members of petitioner's implementation team working with SAP and ICS Deloitte determined the operational and functional needs of each subsidiary in order to configure and customize the system;

- The implementation team worked to configure and modify the R/3 System to adapt the system to each subsidiary's identified needs;

- The implementation and ABAP programming teams worked to customize the R/3 System to meet petitioner's functional needs;

- The ABAP programming teams created codes for hundreds of user exits to integrate external programs with the R/3 System, so that petitioner was able to realize the functionality needed for its unique business while preserving the functional efficiencies of the R/3 System; and

- The ABAP programming teams created new subsystems to run parallel to the R/3 System for operations not available within the R/3 System more critical to petitioner's business.

¶ 87. Moreover, the DOR conceded that more than 3,000 modifications were made to the R/3 System. The R/3 System is not prewritten because it is not available for general use; in fact, it could not be used unless and until it was customized.

¶ 88. What makes factor six arguable is that the R/3 System exists and can be sold to everyone in the same form, i.e., all purchasers seem to receive disks,

and they select specific modules and make other changes in order to make the R/3 System fit their needs. We acknowledge the DOR's arguments that the basic R/3 System was existing rather than created and that it was to some extent already encoded rather than built entirely from scratch. These considerations could weigh in the DOR's favor in that at least this initial program is non-custom and thus its $5.2 million cost should be taxable.

¶ 89. However, when we consider that this initial or basic R/3 System is useless until modified, that customization is time-consuming and expensive and thus significant, and that every purchaser must have the R/3 System modified in order to make use out of it, we cannot conclude that this is a prewritten program under factor six. It is not available for general use—in fact no one can use it without modifications—and thus, it is not canned or prewritten. Rather, the basic R/3 System modules are available to become a custom program. Thus, the Commission's conclusion was reasonable.

¶ 90. This is unlike a program such as Microsoft Excel. While a purchaser may wish to modify Excel so as to make it more efficient or enhance its capabilities, the program can and is used "right out of the box" by a number of purchasers. The R/3 System is not such a prewritten program.

¶ 91. The DOR argues that factor six contains mandatory language, which is controlling over the more general language of factors one through five. However, this is not consistent with other language in the rule. The rule instructs that all facts and circumstances shall be considered including the seven factors in the rule. It does not say that all factors may be considered but one or even two of the factors can be dispositive. The DOR

argues that the Commission's interpretation renders factor six surplusage, but the DOR's interpretation could render the other factors and portions of the rule surplusage except for factor six. The reasonable approach is to consider all of the factors and all the facts and circumstances. The Commission did just that, and it is not for this court to override that decision if the Commission's actions were reasonable.

¶ 92. Additionally, because we agree with the conclusion that, under subsection (k) of factor six, this is not prewritten or canned, this factor alone does not control the analysis. It is worth noting, however, that under the current language, it would be difficult to conclude that a program is custom even when factors one through four weigh in favor of finding it custom but it is clearly prewritten or canned under factor six. Perhaps then, factor seven becomes crucial to the analysis. Today, however, this scenario is not before us.

¶ 93. The DOR also argues that the Commission's interpretation ignores the rule-making process. One definition of "prewritten" that was suggested but rejected was prewritten is "intended for general use and mass distributions as prepackaged ready-to-use programs." The DOR rejected this definition because there are situations where prewritten programs may not be mass produced. Presumably, the DOR takes issue with the following sentences in the Commission's decision:

> Our conclusion that the distinction between "prewritten programs" and "custom programs" hinges on the amount of effort needed to bring software online for a particular customer is consistent with the first four factors and consistent with the definition of "prewritten programs." With respect to the latter, if a program is prepared, held or existing for general use normally for more than one customer, then the program will require

635

relatively little effort to be put in place for any user. If, on the other hand, a program like the R/3 System is useful only after a significant investment of resources in planning, testing, training, enhancement, and maintenance, then the software cannot be said to be prepared, held or existing for general use.

*Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) ¶ 400–719, at 32,856 (WTAC 2003) (footnotes omitted).

¶ 94. The DOR seems to overstate the Commission's position. The Commission simply reasons that the more effort it takes to get a program up and running, the more likely the program is not prewritten or canned and thus not available for general use. It does not, however, naturally follow from this proposition that the Commission has concluded that prewritten programs must be mass produced. In fact, a prewritten program could be utilized by only a few customers. If a program is available for general use, however, it is more likely—even if it is not dispositive—that a program does not require substantial effort, cost, and modifications to get a program up and running. While some of the Commission's reasoning regarding factor six is confusing, its overall conclusion was reasonable. The R/3 System is not a prewritten program because it is not available for general use.

¶ 95. Under factor seven, regarding an "existing program [] selected for modification," the Commission concluded that factor seven did not apply "given the Commission's conclusion that the R/3 System is a custom program." The Commission stated, "[t]his factor only makes sense in the overall scheme presented by [Wis. Admin. Code § ] Tax 11.71[(1)](e) if one concludes that 'existing program' means an 'existing program for general use' as that phrase is used in the definition of

'prewritten programs' in [Wis. Admin. Code] section Tax 11.71(1)(k)." While the Commission could have used different language rather than stating that factor seven does not apply because it has determined the software is custom, the Commission's overall reasoning regarding factor seven is reasonable.

¶ 96. Instead of stating that factor seven does not apply because the program is custom, perhaps the Commission should have stated that factor seven does not apply because the program was not prewritten and thus not an existing program. "Existing program" under factor seven must refer to prewritten or canned programs because otherwise "existing programs" would include custom programs. The DOR states that "the sale of an 'existing' program is a sale of tangible personal property" and thus taxable, which means it is not custom. Prewritten or canned programs are available for general use. Thus, it makes sense that "existing program" means existing program for general use.

¶ 97. Factor seven should not be completely disregarded merely because other factors suggest that a program is custom. Factor seven, just like all the other factors and the facts and circumstances, should be used to determine whether a program is custom. While the Commission may not have selected the same language that this court would have selected, the Commission's subsequent statements and reasoning are sound. Factor seven considers existing programs for general use, and because the Commission reasonably concluded that this program did not exist for general use, factor seven does not apply.

¶ 98. The DOR, however, argues that factor seven does apply and that the R/3 System was prewritten and not modified by SAP before shipping it to Menasha, which the DOR determines to be critical to the appli-

cation of factor seven. Because the Commission reasonably concluded that factor seven does not apply and we must be mindful of the deference we owe to the Commission, we reject the DOR's arguments. The Commission reasonably concluded that the R/3 System was not available for general use and therefore not canned or prewritten. Factor seven applies only when a program is an existing program, i.e., canned or prewritten, and thus existing for general use. The R/3 System did not exist for general use even though it did "exist," and thus, factor seven does not apply.

¶ 99. The DOR also argues that factor seven contains mandatory language and that the Commission's interpretation renders factor seven surplusage. For the reasons stated in our discussion of factor six, we reject the DOR's mandatory language and surplusage arguments. *See* ¶¶ 85–91.

¶ 100. Lastly, under all the facts and circumstances, the Commission considered the cost of the R/3 System, and it concluded that this weighed in favor of the R/3 System being a custom program. Under all the facts and circumstances, it is reasonable for the Commission to consider the cost of the R/3 System. While we acknowledge that a canned or prewritten program available for general use could be very expensive, cost is still a factor that may be considered by the Commission. Cost alone, however, is not dispositive. The Commission reasonably concluded that under the rule's language, all the facts and circumstances along with all seven factors must be considered and thus cost, even when over $10,000 and thus not relevant under factor five, may be considered.

¶ 101. We must afford the Commission's decision controlling weight deference if it reasonably interprets the rule at issue. *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 22.

Our inquiry is whether the Commission's decision was reasonable and consistent with the meaning or purpose of the regulation. In addition, under the controlling weight deference standard, a court should refrain from substituting its view of the law, and will sustain the agency's conclusions if they are reasonable. We sustain an agency's conclusions even if an alternative view of the law is just as reasonable or even more reasonable. Thus, if the Commission reasonably interprets the rule and its determination is consistent with the rule's meaning or purpose, we must afford the Commission controlling weight deference.

¶ 102. The Commission concluded that the R/3 System was "a custom program because of the significant investment [Menasha] made in presale consultation and analysis, testing, training, written documentation, enhancement, and maintenance support, and because it [was] not a prewritten program."

¶ 103. We too are persuaded by the initial cost, the costs for modifications, the presale consultations over the span of a few years, the testing required once installed, the requisite training, the requisite enhancement and maintenance, and that the R/3 System cannot be used until modified—in this case some 3,000 modifications. As a result, we conclude that the Commission's conclusion that the R/3 System was custom is reasonable. Accordingly, we will not substitute our judgment for that of the Commission's.

¶ 104. While the program was not loaded by the vendor, and the vendor itself was not obligated pursuant to the licensing agreement to modify the R/3 System here, we still conclude that the R/3 System is a custom program. Under the rule's current language, it is irrelevant whether the vendor or an independent consultant carries out the modifications, and it is irrel-

evant whether those modifications take place before or after it leaves the vendor. The rule's language simply does not identify those as factors to be considered. While who modifies an existing program, under factor seven, is relevant, this does not appear, under the rule's language, to extend to situations that do not involve prewritten or canned programs.

¶ 105. The Commission reasonably concluded that all the facts and circumstances and all seven factors must be considered when determining whether a program is custom. Applying this construction to the particular facts of this case, the Commission reasonably concluded that the R/3 System was a custom program.

¶ 106. Finally, a brief response to the dissents is warranted. Once one sifts through the unnecessary rhetoric of the dissents, it is clear that the dissents are based on certain fundamental flaws. For example, the dissents undertake a project to rewrite the law. The legislature specifically designated the Commission as "the final authority for hearing and determination of all questions of law and fact" under the tax code. The Commission's decision is entitled to deference. The Chief Justice's dissent dissects Wis. Admin. Code § Tax 11.71(1)(e) in a manner that ignores the plain language of the entire rule, and instead, it creates a never before recognized or argued two-prong test. *See* Chief Justice Abrahamson's dissent, ¶¶ 180–182. Neither the DOR nor Menasha use this first sentence of the rule as the first prong of a two-prong test. Despite that dissent's assertions, the rule does not end with the first sentence.[25] Rather, as Attorney McGinnity so aptly stated

---

[25] When the DOR has referenced the first sentence of the rule, it has been in tandem with the remainder of the rule. *See* DOR briefs: at 27 and 33 of its brief in chief, at 11–12 of its

at the court of appeals' oral argument on November 17, 2005: "The preface language in Sub (1)(e) talks about [a] custom program as being one that accommodates the special processing needs of the customer. And then the rule goes forward with a number of factors as to how you figure out if it is a program that is accommodating the special processing needs of the customer." This correct interpretation is also in conflict with Justice Bradley's interpretation of the rule. *See* Justice Bradley's dissent, ¶¶ 217–225. However, because the plain language of the rule specifically states that "[t]he determination of whether a program is a custom program shall be based upon all the facts and circumstances, including the following" seven factors, we disagree with Justice Bradley's interpretation. As to the remaining arguments raised by the dissents, they have been otherwise addressed in the majority opinion.

## V. CONCLUSION

¶ 107. Accordingly, we affirm the court of appeals' decision. We conclude that the Commission's statutory interpretation of Wis. Stat. § 77.51(20) is entitled to due weight deference, and that its rule interpretation of Wis. Admin. Code § Tax 11.71(1)(e) is entitled to controlling weight deference. We further conclude that when a DOR decision is appealed by the taxpayer to the Commission, the Commission is not required to give deference to the DOR's interpretation of Wis. Admin. Code § Tax 11.71(1)(e) when deciding that appeal.

response to the non-party brief, at 4 and 7 of its reply brief, *DOR v. Menasha Corp.*, 2008 WI 88, 311 Wis. 2d 579, 754 N.W.2d 95 (asserting the first sentence of the rule but in discussion with factors six or seven or subsection (k)). The briefs can be viewed at the Wisconsin State Law Library, 120 Martin Luther King Jr. Blvd., 2nd Floor, Madison, Wisconsin 53707–7881.

¶ 108. Finally, we conclude that when applying the controlling weight deference standard to the Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e), the Commission reasonably interpreted the rule and concluded that the R/3 System was custom.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 109. N. PATRICK CROOKS, J. *(concurring).* While I join the majority opinion, I write separately to emphasize that resolving the issue of deference is key to a correct decision in this case. Rules regarding deference are important limits that respect the different roles of the branches of government. Granting the appropriate level of deference to the Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e) and (k)[1]

---

[1] Wisconsin Admin. Code § Tax 11.71(1)(e) and (k) are found within the "Definition of Terms" subsection of the code relating to the computer industry. They state:

(e) "Custom programs" mean utility and application software which accommodate the special processing needs of the customer. The determination of whether a program is a custom program shall be based upon all the facts and circumstances, including the following:

1. The extent to which the vendor or independent consultant engages in significant presale consultation and analysis of the user's requirements and system.

2. Whether the program is loaded into the customer's computer by the vendor and the extent to which the installed program must be tested against the program's specifications.

3. The extent to which the use of the software requires substantial training of the customer's personnel and substantial written documentation.

4. The extent to which the enhancement and maintenance support by the vendor is needed for continued usefulness.

5. There is a rebuttable presumption that any program with a cost of $10,000 or less is not a custom program.

and Wis. Stat. § 77.51(20),[2] I concur that the Commission's decision should be upheld.

¶ 110. The threshold question on the issue of deference is whether it is the DOR's interpretation or the Commission's interpretation of the statute and the rules that is entitled to deference. I concur that it is the Commission's interpretation which is entitled to deference, while recognizing that the DOR's interpretation certainly must be carefully reviewed as well.

¶ 111. In *DaimlerChrysler v. LIRC*, 2007 WI 15, 299 Wis. 2d 1, 727 N.W.2d 311, we treated a rule promulgated by the DWD and reviewed by LIRC as the

---

6. Custom programs do not include basic operational programs or prewritten programs.

7. If an existing program is selected for modification, there must be a significant modification of that program by the vendor so that it may be used in the customer's specific hardware and software environment.

. . . .

(k) "Prewritten programs," often referred to as "canned programs," means programs prepared, held or existing for general use normally for more than one customer, including programs developed for in-house use or custom program use which are subsequently held or offered for sale or lease.

[2] Wisconsin Stat. § 77.52(1) imposes a tax on "the sale, lease or rental of tangible personal property . . . ." Wisconsin Stat. § 77.51(20) defines tangible property as follows:

"Tangible personal property" means all tangible personal property of every kind and description and includes electricity, natural gas, steam and water and also leased property affixed to realty if the lessor has the right to remove the property upon breach or termination of the lease agreement, unless the lessor of the property is also the lessor of the realty to which the property is affixed. "Tangible personal property" also includes coins and stamps of the United States sold or traded as collectors' items above their face value and computer programs except custom computer programs.

functional equivalent of LIRC's own rule for purposes of analyzing the level of deference due. *Id.*, ¶ 11 (citations omitted). ("Here, the LIRC reviewed a rule promulgated by the DWD, not the LIRC's own rule. The LIRC is an adjudicative body charged only with resolving certain disputes. . . . The LIRC does not make rules, except for rules governing its own procedures.") This court reasoned that "[a]n administrative agency that regularly works with the rules and regulations of another agency, whose actions it is authorized by the legislature to review, is in the best position to interpret such rules and regulations because the agency knows the specific purposes of the rules and regulations . . . and has expertise in the area the agency is called upon to review." *Id.*, ¶ 22 (citation omitted). That description applies with equal force to the relationship between the DOR and the Commission.

¶ 112. Further, granting deference to the Commission is consistent with the analysis in *Caterpillar*, which, like this case, concerned a conflict between the DOR and the Commission. There the court of appeals found that "[b]ecause the commission is the final administrative authority that reviews the decisions of the DOR, any deference that might be due to the decision of an administrative agency is due to the commission, not to the DOR." *DOR v. Caterpillar, Inc.*, 2001 WI App 35, ¶ 6, n.3, 241 Wis. 2d 282, 625 N.W.2d 338, review denied, 2001 WI 43, 242 Wis. 2d 545, 629 N.W.2d 784. A fair reading of the *DaimlerChrysler* and *Caterpillar* cases leads to the conclusion that the agency whose interpretation is entitled to deference here is the Commission.

¶ 113. The deference afforded to the Commission's interpretation of the administrative rules is significant in this case, since such rules are the

functional equivalent of the Commission's rules. "An administrative agency's interpretation of its own rules or regulations is controlling unless 'plainly erroneous or inconsistent with the regulations.' " *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 11 (citations omitted).

¶ 114. I concur with the majority that the Commission's interpretation of the relevant administrative rules—which contain the language crucial to resolving this case—is entitled to controlling weight deference. The Commission applied all seven factors in Wis. Admin. Code § Tax 11.71(1)(e), as well the definition of "prewritten programs" in Wis. Admin. Code § Tax 11.71(1)(k) in determining whether the R/3 system here was a custom program or a prewritten program. I am satisfied that the Commission's decision is neither plainly erroneous nor inconsistent with the rules, and that it is reasonable.

¶ 115. In their dissents, Chief Justice Abrahamson and Justice Bradley decline to defer to the Commission's interpretation on the grounds that the interpretation is inconsistent with the administrative rules. Chief Justice Abrahamson's dissent, ¶ 143; Justice Bradley's dissent, ¶ 214. That conclusion rests on an alternative interpretation that carves just eight words from a single sentence, taken from the definition of custom programs, designates those eight words as the relevant definition, and seemingly ignores the surrounding text. Part of Wis. Admin. Code § Tax 11.71(1)(e) that is excised by such a reading expressly directs that such a determination be based on "all the facts and circumstances" and lays out the seven factors to determine whether a program is a custom program. If a workable and complete definition could be garnered from the last eight words of the sentence, the rest of the definition would then be surplusage. The seven factors

and the language requiring consideration of "all the facts and circumstances" are there for a reason, and they make a difference here. Ignoring the requirement that the factors shall be considered leaves the definition open to being read many different ways. Ignoring those factors cannot be the correct approach because the rule says the determination "shall be based upon all the facts and circumstances, including [the seven factors] . . . ." Wis. Admin. Code § Tax 11.71(1)(e).[3]

¶ 116. The error in both dissents comes in taking the last eight words of a sentence *from* the definition and saying it *is* the definition. *See* Chief Justice Abrahamson's dissent, ¶ 148; Justice Bradley's dissent, ¶ 214. The punctuation denotes the end of the sentence, not the end of the definition. Even within Wis. Admin. Code § Tax 11.71(1), a section setting forth the

---

[3] An inappropriately narrow focus on eight words in a single sentence in the Commission's extensive analysis (see Chief Justice Abrahamson's dissent, ¶ 168) ignores the Commission's analysis in the same way that the inappropriately narrow focus on those words in the administrative rule ignores the rest of the definition. The record clearly shows that the Commission started its analysis with the administrative rule's first sentence, designating it parenthetically as the definition's "intro." "Intro" clearly meant "introduction," which in turn clearly meant that it was prefatory material, indicative that something else follows. The Commission then proceeded to construe and apply the remainder of the definition section—in other words, the seven factors. The Commission clearly indicated, by calling that portion the "intro," how it was proceeding. There is therefore no inconsistency in either the Commission's interpretation of the rule or my deference to it. (Justice Bradley cites to this paragraph and includes the Commission's parenthetical designation of the first sentence in Wis. Admin. Code § Tax 11.71(e) as the "intro," but she does so without acknowledging its significance. Justice Bradley's dissent, ¶ 221.)

"Definitions of Terms," six of the subsections define terms with definitions that have more than one sentence. *See* § Tax 11.71(1)(b), (c), (e), (i), (L), and (m).

¶ 117. It was hardly "plainly erroneous or inconsistent with the regulations"—the standard we apply here concerning interpretation of these administrative rules—for the Commission to interpret the rules by reading the full text of the subsection and examining and applying each factor to the facts of this case. The court of appeals rightly noted in its opinion,

> As the commission pointed out, Wis. Admin. Code § Tax 11.71(1)(e) requires that the commission consider "all facts and circumstances" in determining whether a computer program comports with the definition of a custom program, including factors 1.—7. of the tax rule. We observe that the plain language of § Tax 11.71(1)(e) imposes this requirement. ... Aside from its narrow and unreasonable interpretation of § Tax 11.71(1)(e), the DOR offers no reason for why we should ignore the commission's determination that the tax rule shall be considered in its entirety in determining whether a computer program is customized.

*DOR v. Menasha Corp.*, 2007 WI App 20, ¶ 49, 299 Wis. 2d 348, 728 N.W.2d 738.

¶ 118. Controlling weight deference (similar to great weight deference applied to statutory interpretation (*DaimlerChrysler*, 299 Wis. 2d 1, ¶ 15)) is appropriate here, because the Commission reasonably interpreted a rule adopted by the DOR, the Commission's interpretation was not inconsistent with the rule's language or clearly erroneous, and the Commission was charged by the legislature with the responsibility of reviewing decisions of the DOR. *Id.*, ¶ 13; *see also* Wis.

Stat. § 73.01(4)(a). The Commission regularly works with the rules and regulations of the DOR.

¶ 119. Finally, under controlling weight deference, proposing an equally reasonable alternative interpretation of the administrative rules, or even an alternative interpretation that is more reasonable (*Caterpillar*, 241 Wis. 2d 282, ¶ 6), does not render the interpretation of the Commission plainly erroneous or inconsistent with the administrative rules. Multiple interpretations may well be consistent with the rules and regulations. That is why it is so important to get the deference analysis right here. By applying controlling weight deference to the Commission's decision on the interpretation of the administrative rules involved, I am satisfied that its decision must be upheld. The DOR has not established that the Commission's determinations are unreasonable, irrational, or plainly erroneous.

¶ 120. The statutory interpretation necessary in this case is at best perfunctory. The relevant statutory language merely establishes that an exemption from tax exists for "custom computer programs." Under the statute, " '[t]angible personal property,' " i.e., taxable property, "includes . . . computer programs *except custom computer programs*." Wis. Stat. § 77.51(20) (emphasis added). Tax liability or lack thereof is certainly the heart of this case, but the dispute here is not centered on whether custom computer programs are exempted from tax under the statute. The parties agree on that. Thus, while it is necessary to acknowledge the statutory framework, the statute does not contain any language that is helpful to the resolution of the disputed matter. As counsel for the DOR said in oral argument before this court, "The outcome of this case depends entirely upon the application of an administrative rule promul-

gated by the department. That rule determines whether or not a software sale by a software vendor is subject to sales and use tax."

¶ 121. To the extent that statutory interpretation comes into play it does so because "[w]hen an administrative agency promulgates regulations pursuant to a power delegated by the legislature, we construe those regulations 'together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.'" *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 10 (citation omitted). While it is necessary to consult the statute involved (Wis. Stat. § 77.51(20)) before moving on to parse the administrative rule involved, it seems to me to be unnecessary to determine the level of deference due to the Commission's interpretation of the statute. This case turns on the interpretation of administrative rules rather than on the statute.

¶ 122. The majority discusses the three levels of deference—great weight, due weight, and no deference —accorded an agency's interpretation of a statute, as well as the circumstances under which each is appropriate. Majority op., ¶¶ 47–50. I note that the majority applies due weight deference to the Commission's statutory interpretation, and I see no reason to take issue with that holding, since I believe such a determination is not required to resolve this case. I recognize, however, that "[w]hen applying due weight deference, we will not overturn a reasonable agency interpretation that is consistent with the purpose of the statute, unless there is a more reasonable interpretation." *DaimlerChrysler*, 299 Wis. 2d 1, ¶ 17 (citation omitted).

¶ 123. Because the Commission's decision was consistent with the purpose of the statute—to exempt custom computer programs from tax—and because I do

not think a more reasonable interpretation was set forth by the DOR, there certainly is no reason to overturn the decision based on the Commission's interpretation of the statute.

¶ 124. As Chief Justice Abrahamson's dissent notes, the tax code is designed to ensure that taxpayers pay what they owe and no more. Chief Justice Abrahamson's dissent, ¶ 127. What is owed is determined by Wisconsin statutes and administrative rules and regulations. The dispute as to the application of the relevant statute, and especially the interpretation of the rules, was adjudicated by the Commission. Its interpretation is entitled to controlling weight deference. Here, the tax rules and regulations were reasonably interpreted by the appropriate adjudicative body, authorized to do so by the legislature. It was the Commission's considered and reasonable opinion, taking into account all the facts and circumstances as required by Wis. Admin. Code § Tax 11.71(1)(e), that Menasha's computer program was a custom computer program, not a prewritten program. Since it was, therefore, not tangible personal property, it was not subject to the tax that the DOR attempted to impose. Like all taxpayers, Menasha is required to pay the taxes on taxable purchases only—no more, no less.

¶ 125. For these reasons, I respectfully concur.

¶ 126. I am authorized to state that Justices DAVID T. PROSSER and PATIENCE DRAKE ROGGENSACK join this concurrence.

¶ 127. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). Each taxpayer should pay the taxes that he or she owes under the tax laws—no more, no less. The majority opinion rewrites the plain language of the

governing law and creates a new exemption in the tax laws that the legislature did not see fit to enact.

¶ 128. The majority opinion states that its decision "has great import to the average taxpayer in this state."[1] I agree. The fiscal implications of the new tax exemption created by the majority opinion are substantial: According to the Legislative Fiscal Bureau's January 30, 2007, revenue and expenditure projections, the state's projected loss in revenue as a result of the erroneous decision in the present case will exceed $277.6 million prior to the end of the 2007–09 biennium and $28.3 million annually thereafter.[2] Wisconsin taxpayers will pick up the tab left by those who have escaped taxation as a result of the majority opinion.

¶ 129. A court should not effectively override an enacted tax statute by imposing the court's views of economic policy or of the wisdom of a tax law. With this principle in mind, I examine the text of the applicable statute and administrative rule.

¶ 130. The legal question presented, and the facts, are really rather simple when stripped to their essence.

¶ 131. **Here's a snapshot of the law:** Wisconsin taxes the sale, lease or rental of tangible personal property.[3] " **'Tangible personal property'** . . . in-

---

[1] Majority op., ¶ 5.

[2] *See* letter from Robert Wm. Lang, Director, Legislative Fiscal Bureau, to Sen. Russell Decker & Rep. Kitty Rhoades, Chairs, Joint Committee on Finance (Jan. 30, 2007), *available at* http://www.legis.state.wi.us/lfb/Misc/2007_01_30_Revenue Estimates.pdf (last visited June 27, 2008).

[3] Wisconsin's retail sales tax applies to receipts from the sale, lease, or rental of tangible personal property. *See* Wis. Stat. § 77.52(1) (providing in relevant part that "[f]or the privilege of

cludes . . . computer programs except custom computer programs." Wis. Stat. § 77.51(20) (2003–04).[4]

¶ 132. A custom computer program is defined by the Department of Revenue's rule, Wis. Admin. Code § Tax 11.71(1)(e), (k), and (m), which everyone agrees governs the instant case. According to the administrative rule, the words **"custom computer program" mean "utility and application software which accommodate the special processing needs of the customer."**[5] The administrative rule also provides that **custom programs do not include "prewritten programs" (sometimes also called "canned programs"),**[6] **which are "programs prepared, held or existing for general use normally for more than one customer . . . ."**[7] A program is either a (taxable) prewritten program or a (tax-exempt) custom program; it cannot be both.[8]

---

selling, leasing or renting tangible personal property . . . at retail a tax is imposed upon all retailers at the rate of 5% of the gross receipts from the sale, lease or rental of tangible personal property . . . sold, leased or rented at retail in this state").

Wisconsin's use tax applies to the use of tangible personal property purchased from a retailer. *See* Wis. Stat. § 77.53(1) (providing in relevant part that "an excise tax is levied and imposed . . . on the storage, use or other consumption in this state of tangible personal property purchased from any retailer, at the rate of 5% of the sales price of that property . . .").

[4] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

[5] Wis. Admin. Code § Tax 11.71(e) (Sept. 2006).

[6] Wis. Admin. Code § Tax 11.71(1)(e)6. (Sept. 2006).

[7] Wis. Admin. Code § Tax 11.71(1)(k) (Sept. 2006).

[8] Wis. Admin. Code § Tax 11.71(1)(m) (Sept. 2006) ("For purposes of this section a program is either a prewritten or custom program.").

¶ 133. **Here's a snapshot of the facts:** In 1995 SAP leased its R/3 System to Menasha Corporation. The R/3 System consists of some 70 software modules, each providing a rudimentary business and accounting software system for a customer's business. The R/3 System is not designed specifically for any customer. R/3 is a product that SAP leases in unmodified form to many customers. In other words, the R/3 System is a platform that an individual business uses for creating its own customized business and accounting software. SAP's customers must undertake their own modification of the R/3 platform to customize it for their own business needs.

¶ 134. By 1998 SAP had leased this same software to more than 20,000 customers across the world.[9] In 1997 *Business Week* noted that "SAP's R/3 runs the back offices of half of the world's 500 top companies— scheduling the manufacture of washing machines at General Electric Co. and shipping soda pop on time at Coca-Cola Co."[10]

¶ 135. The leasing arrangement between SAP and its customer (here Menasha Corporation) is separate and distinct from any arrangements the customer thereafter makes with any entity for modifying the R/3 System to meet the customer's particular software needs.

¶ 136. The lease of the R/3 software by SAP to Menasha Corporation for $5.3 million (which did not oblige SAP to provide customization services) is the

---

[9] Martin Campbell-Kelly, *From Airline Reservations to Sonic the Hedgehog: A History of the Software Industry* 196 (MIT Press 2003).

[10] Campbell-Kelly, *supra* note 9, at 197 (quoting Gail Edmondson et al., "Silicon Valley on the Rhine," *Business Week*, Nov. 3, 1997, at 40, 42).

basis for the tax in the present case. Relevant to the instant case, the Department of Revenue is not imposing a tax on expenditures of more than $16 million that Menasha Corporation made over the next seven years to customize the R/3 System.

¶ 137. In sum, the R/3 System was not written solely for Menasha Corporation or upon its request. SAP had developed the R/3 System before meeting up with Menasha Corporation and has leased the same R/3 System to thousands of customers.

¶ 138. The majority opinion agrees that "the R/3 System exists and can be sold to everyone in the same form."[11]

¶ 139. **Here's the legal question of statutory interpretation presented:** Is the R/3 System of 70 modules leased by SAP to Menasha Corporation in 1995 a taxable "computer program" or a tax-exempt "custom computer program" as these words are defined in the administrative rule?

¶ 140. **Here's a snapshot of the majority opinion's answer to the legal question:** The majority opinion hides behind the decision of the Tax Appeals Commission. It cannot hide. It bears full responsibility for the result.

¶ 141. Interpretation of a statute or a rule is a question of law determined by this court independently of other courts or administrative agencies. In interpreting a statute or an agency rule, a court may, but need not, accord an agency's interpretation of a statute deference or weight. The court reserves its authority to interpret the law. Indeed, it is the court's responsibility to decide questions of law and to determine whether deference is due and what level of deference is due to an

---

[11] Majority op., ¶ 88.

agency interpretation and application of a statute.[12] By granting deference or weight to an agency interpretation, the court does not, and should not, abdicate its authority and responsibility to decide questions of law.[13]

¶ 142. Furthermore, deference or weight is due to an administrative agency only when the agency's interpretation is consistent with the language, meaning, and purpose of the statute or rule and is reasonable.[14] The court itself must always interpret the statute to determine the reasonableness of the agency determination.[15]

¶ 143. In the present case, the Tax Appeals Commission's interpretation of the statute and rule governing computer software and custom computer software is inconsistent with the language, the meaning, and the purpose of the statute and administrative rule and is not reasonable. The Tax Appeals Commission's determination therefore cannot be entitled to any deference or weight as this court determines the question of law presented.

---

[12] *Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals*, 2006 WI 86, ¶ 14, 292 Wis. 2d 549, 717 N.W.2d 184.

[13] *Id.*

In several tax cases the court has stated that when the facts are undisputed, a court may substitute its judgment for that of the Department of Revenue or the Tax Appeals Commission regarding the interpretation and application of a statute to the undisputed facts. *See, e.g., DOR v. Bailey-Bohrman Steel Corp.*, 93 Wis. 2d 602, 606–07, 287 N.W.2d 715 (1980); *H. Samuels Co. v. DOR*, 70 Wis. 2d 1076, 1083–84, 236 N.W.2d 250 (1975). Later cases have moved away from these cases without explanation and without overruling these cases.

[14] Majority op., ¶¶ 53–54, citing *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶¶ 11, 13, 19, 299 Wis. 2d 1, 727 N.W.2d 311.

[15] *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 14.

¶ 144. Nevertheless, the majority opinion hides behind the Tax Appeals Commission by spending many pages uselessly, confusingly, and often erroneously discussing whether the Department of Revenue's interpretation of its own rule or the Tax Appeals Commission's interpretation of the Department's rule should be given some kind of weight as the court determines the question of statutory interpretation presented.[16] All of this

---

[16] I do not reach the hypothetical issue whether deference would be due to the Tax Appeals Commission's interpretation of the administrative rule if the Commission's interpretation were reasonable. I do, however, disagree with the majority opinion's discussion of the issue of deference in the instant case. I note two obvious errors in the majority opinion.

First, it does not make sense for the majority opinion to conclude that although this court owes only "due weight" deference to the Tax Appeals Commission's interpretation of Wis. Stat. § 77.51, the court must give the Commission "controlling weight" deference insofar as the Commission interprets the Department of Revenue's administrative rule interpreting Wis. Stat. § 77.51. *See* majority op., ¶ 53. How can the majority opinion hold that the Commission's interpretation of the Department's interpretation of Wis. Stat. § 77.51 is entitled to a higher level of deference than the Commission's interpretation of the statute itself?

Second, the majority opinion is incorrect to conclude that whether the Department of Revenue has acquiesced in the Commission's interpretation of a statute or administrative rule has "no relationship" to this court's determination whether deference is due (and how much deference may be due) to the Commission's interpretation. *See* majority op., ¶ 71. This court has previously recognized that whether an adjudicative agency's interpretation of a statute has been embraced by a line agency (the Department of Revenue in the instant case) may be relevant to the question what level of deference is due to the adjudicative agency's interpretation. *See Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 53 (stating that when the Divi-

discussion in the majority opinion is beside the point, given that the Commission's interpretation is, in any case, unreasonable and should be given no deference at all.

¶ 145. The majority opinion does not take seriously its duty to render its own interpretation of the administrative rule and to scrutinize the reasonableness of the Commission's interpretation. Although con-

sion of Hearings and Appeals adjudicates disputes under certain statutes, the level of deference owed to the Division's decision depends upon whether the line agency sharing concurrent jurisdiction with the Division has adopted the Division's decision as its own).

For the statutory provisions regarding the Department of Revenue's power to acquiesce or not acquiesce in the Commission's interpretation of a statute, see Wis. Stat. § 73.01(4)(e)1. and § 73.015(2) (providing that the Tax Appeals Commission's interpretation of a statute is not binding upon the Department in future cases when the Department seeks review of the order or decision of the Commission construing the statute); Wis. Stat. § 73.01(4)(e)2. (providing that even when the Department does not seek review of the Commission's decision or order, the Department may issue a "notice of nonacquiescence," the effect of which is that "although the decision or order is binding on the parties for the instant case, the commission's conclusions of law, the rationale and construction of statutes in the instant case are not binding upon or required to be followed by the department of revenue in other cases.").

The Internal Revenue Service similarly may acquiesce or not acquiesce in decisions of the United States Tax Court. Susan A. Berson, *Federal Tax Litigation* § 1.01[7], at 1–13 (2008). In reviewing decisions of the United States Tax Court, the federal courts owe no deference to the Tax Court's interpretation of the Internal Revenue Code, or to the Tax Court's interpretations of the law generally. 3 Laurence F. Casey, *Federal Tax Practice* § 9.06, 9–13 to 9–14 (2007).

ceding numerous imperfections in the Tax Appeals Commission's Ruling and Order,[17] the majority opinion does its best to paper over, or to ignore, the Commission's obvious failures to remain faithful to the clear text of Wis. Admin. Code § Tax 11.71(1). The majority opinion abandons its responsibility as the ultimate authority to decide issues of law, perfunctorily and unpersuasively concluding that the decision of the Tax Appeals Commission is consistent with the administrative rule and is reasonable.

¶ 146. **Here's a snapshot of the Tax Appeals Commission's erroneous reasoning (upon which the majority opinion erroneously rests):** The Tax Appeals Commission makes two critical errors in interpreting and applying Wis. Admin. Code § Tax 11.71(1).

¶ 147. First, and most importantly, the Tax Appeals Commission utterly disregards the administrative rule's definition of nontaxable "custom programs" as "utility and application software which accommodate the special processing needs of the customer." Nowhere in its opinion does the Tax Appeals Commission apply the rule's definition to the facts of the present case. The Commission's opinion effectively repeals the administrative rule's clear language setting forth this definition.

¶ 148. The R/3 System that SAP leased to Menasha clearly does not fit within the rule's definition of "custom programs." Everyone agrees that the R/3 System

---

[17] *See, e.g.*, majority op., ¶ 78 (acknowledging that a portion of the rule's text conflicts with the Commission's application of the rule); majority op., ¶ 85 n.24 ("While the Commission's language is somewhat perplexing . . ."); majority op., ¶ 96 (raising a question about the Tax Appeals Commission's interpretation of Wis. Admin. Code Tax § 11.71(1)(e)7.); majority op., ¶ 95 ("While the Commission could have used different language . . .").

that Menasha Corporation acquired from SAP did not "accommodate the special processing needs of" Menasha. Everyone agrees that the R/3 System is leased in unmodified form to many customers and that the R/3 System does not meet the special processing needs of any particular customer. The Tax Appeals Commission and the majority opinion could not possibly have reached a contrary conclusion if they had honored the text of the administrative rule defining "custom programs."

¶ 149. Second, the Tax Appeals Commission misconstrues the administrative rule's definition of taxable "prewritten programs," adding words and ideas to the plain language of the rule that cannot be found in the rule's text. Prewritten programs are defined in relevant part as "programs . . . existing for general use." The Commission erroneously converts the words "existing for general use" in the administrative rule to read "ready for use off the shelf without any modification."

¶ 150. The essence of the Tax Appeals Commission's decision is that because Menasha Corporation had to customize the R/3 System after the Corporation acquired it, the R/3 System is a custom computer program, not a prewritten program existing for general use. According to the Tax Appeals Commission, the distinction between custom computer programs and prewritten programs hinges on the amount of effort necessary to get the software operational for a particular customer's needs. The Commission concludes that the R/3 System does not "exist for general use," because it is, in the Commission's view, "useful only after a significant investment of resources in planning, testing, training, enhancement, and maintenance . . . ."[18]

---

[18] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,856 (WTAC 2003).

¶ 151. The plain language of the administrative rule does not support the Tax Appeals Commission's interpretation. The administrative rule does not define a prewritten program as one that requires no additional investment from the customer after its acquisition. The rule requires only that a prewritten program is "prepared, held or existing for general use," not that the program is ready for use right off the shelf without any modification. The phrase "for general use" does not include any mention of the amount of time necessary to get the program up and running for the individual customer.

¶ 152. Nor does the fact that the R/3 System is not ready for use off the shelf without any modification mean that the program is not of use or useful in the unmodified state in which SAP leases the program to its customers. Of course the unmodified R/3 System is used and is useful. The R/3 System is used and useful as, in the Tax Appeals Commission's own words, "a rudimentary business and accounting computer software system[.]"[19] SAP's customers use this rudimentary business and accounting computer software system to advance their abilities to build the business and accounting programs that will meet their own particular needs. SAP's customers do not, as the Commission implies, pay millions of dollars to acquire something that has no use.

¶ 153. When the administrative rule's definition of "prewritten program" is applied as written, not as rewritten by the Tax Appeals Commission and the majority opinion, the R/3 System that SAP leased to Menasha clearly fits within the definition of "prewritten program." The R/3 System is an existing program that Menasha Corporation acquired in unmodified form, not

---

[19] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,843 (WTAC 2003).

a program that SAP created or modified at Menasha Corporation's request. The R/3 is suitable for general use; it is used by many customers other than Menasha Corporation. The program thus is a prewritten program "existing for general use normally for more than one customer."

¶ 154. In sum, the Tax Appeals Commission ignores the administrative rule's definition of "custom programs" and rewrites the rule's definition of "prewritten programs." The majority opinion seriously errs in adopting the Commission's interpretation as its own, when the Commission's interpretation is so plainly inconsistent with the rule's language, meaning, and purpose.

¶ 155. This court should, in my opinion, follow the excellent memorandum decision of Judge Steven Ebert of the Dane County Circuit Court, which reversed the deeply flawed decision of the Tax Appeals Commission.

¶ 156. I shall first set forth the undisputed facts, then the applicable administrative rule, and finally I shall apply the statute and rule to these undisputed facts in greater detail than presented in the snapshots above.

I

¶ 157. SAP leased its R/3 software to Menasha Corporation for a license fee of approximately $5.3 million.[20] SAP's lease of its R/3 software to Menasha Corporation was routine in nature and similar to the

_____

[20] *See* majority op., ¶ 20; *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,845, 32,847 (WTAC 2003).

In 1995, Menasha Corporation agreed to lease the R/3 software from SAP for approximately $5.2 million dollars. In 1997, Menasha Corporation then made an additional payment of $100,000 in licensing fees to SAP, bringing the total sum that Menasha Corporation paid for the lease of SAP's R/3 software to approximately $5.3 million.

circumstances of its R/3 sales to its other customers.[21]

¶ 158. The R/3 System is a software product that SAP leases in unmodified form to many customers.[22]

The record does not make clear what Menasha Corporation received in consideration for the additional $100,000 in licensing fees that it paid to SAP in 1997. The parties do not seem to distinguish between Menasha Corporation's initial payment of $5.2 million and its subsequent payment of $100,000. Thus, I assume for purposes of this opinion that the additional payment of $100,000 was, like the initial payment of $5.2 million, for the lease of the R/3 software.

SAP's transaction with Menasha Corporation is denominated a "license" agreement, not a "lease" agreement. However, the term "lease," as it is defined for purposes of Wis. Stat. §§ 77.51–.66, "includes rental, hire and license." Wis. Stat. § 77.51(7). Thus, for purposes of this opinion, I make no distinction between an agreement to "lease" and an agreement to "license." Software license agreements are also ordinarily referred to as "sales." *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1101 (N.D. Ca. 2004) ("These copyrighted software programs are licensed ('sold' is the term applied to these license transactions) . . . .").

[21] *See Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,845 (WTAC 2003).

[22] *See Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,847–32,848 (WTAC 2003). *See also* Campbell-Kelly, *supra* note 9, at 196–97.

Professor Campbell-Kelly explains that although SAP once operated "as a 50–person custom programming outfit rather than a software products firm," SAP's "switch to a software products firm came in 1978," when "SAP decided to rewrite its software as R/2 [a predecessor of R/3], with the medium-term aim of turning it into a product." Campbell-Kelly, *supra* note 9, at 193.

Professor Campbell-Kelly's history of the software industry is accepted as an authoritative text. The United States District Court about Oracle Corporation's efforts to acquire the stock of PeopleSoft, Inc. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1101, 1004 (N.D. Ca. 2004).

SAP's leases of R/3 System software are sales of "off-the-shelf" standardized software; the program is written before the sale and is sold to a wide variety of customers.[23] SAP does not modify the existing software modules before shipment to customers.[24] SAP and Menasha Corporation's agreement made no provision for customization of the R/3 System software by SAP.[25] The customer must implement the R/3 System on its own or hire SAP consultants or SAP approved independent consultants.[26] SAP keeps the lease agreement separate from any agreement relating to consulting and maintenance services.[27]

¶ 159. In other words, the R/3 System is not designed specifically for any customer. SAP itself agreed in a Wisconsin Department of Revenue audit that R/3 is subject to Wisconsin sales tax as "off-the-shelf" standardized software written before the time of the sale and intended to be sold to a wide variety of customers.[28]

---

[23] *See Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,845 (WTAC 2003).

[24] *See Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,845 (WTAC 2003).

[25] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,845 (WTAC 2003).

[26] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,848 (WTAC 2003).

[27] *Id.*

SAP's business practice is to distinguish between and to separate the sale of its R/3 software and any sale of consulting services to its customers. Thus SAP keeps its licensing agreement separate from any agreement for consulting services. The licensing agreement did not obligate SAP to modify the software to suit Menasha Corporation's particular work environment as part of the 1995 license transaction.

[28] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,847 (WTAC 2003).

According to the Tax Appeals Commission, SAP admitted that the R/3 System is prewritten and paid the Department of Revenue more than $1.9 million in tax and interest for sales to Wisconsin customers; SAP further agreed to collect sales and use taxes thereafter.[29]

¶ 160. The R/3 System is an example of Enterprise Resource Planning (ERP) software, that is, "generalized, integrated software that [can] be customized for virtually any large business."[30] The R/3 System contains a basic business and accounting system that did not meet Menasha Corporation's (or any entity's) particular needs for a business and accounting software system.[31] SAP markets the R/3 System not as software that is customiz*ed* to the needs of SAP's customers but rather as software that is customiz*able* to the customer's needs.

¶ 161. Like SAP's other customers, Menasha Corporation acquired the R/3 System from SAP to customize it to meet Menasha Corporation's needs.[32] After licensing the R/3 System from SAP, Menasha Corporation expended a large sum of money over seven years to customize the software to fit its business needs. All told, Menasha Corporation paid approximately $16,275,000 in consulting fees for the purpose of customizing the R/3 software: $13 million to ICS Deloitte (an SAP "logo partner" that Menasha Corporation elected to hire); $2.5 million to SAP; and $775,000 to consultants asso-

---

[29] *Id.* at 32,848.

[30] Campbell-Kelly, *supra* note 9, at 172.

[31] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,843 (WTAC 2003).

[32] Campbell-Kelly, *supra* note 9, at 172.

ciated with neither ICS Deloitte nor SAP.[33] SAP was one of at least five different groups of personnel involved in the implementation team that modified R/3 to meet Menasha Corporation's needs.

¶ 162. The Department of Revenue imposed $265,093 in sales or use taxes on the $5.3 million that Menasha Corporation paid to SAP for the lease of the R/3 software.[34] It is this tax that is at issue in the present case.[35] Menasha Corporation's refund claim

---

[33] *See* majority op., ¶ 22; *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,847 (WTAC 2003).

[34] $265,093 is approximately 5% of $5.3 million.

Both Menasha Corporation and the Tax Appeals Commission are not consistent in referring to the taxes at issue as "sales" taxes or "use" taxes. The Tax Appeals Commission variously characterizes Menasha Corporation's claim as one for the refund of "use tax" payments, "sales tax" payments, and "sales and use tax" payments. *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,843, 32,848, 32,857 (WTAC 2003).

The retail sales tax ordinarily is imposed on the retailer, in this case SAP. Wis. Stat. § 77.52(1). However, Menasha Corporation apparently contracted with SAP to pay any retail sales tax arising from SAP and Menasha Corporation's lease agreement for the R/3 software. *See* majority op., ¶ 30; *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,848 (WTAC 2003).

[35] Menasha Corporation initially sought a refund of $342,614.45. Majority op., ¶ 24; *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,843 (WTAC 2003). However, the $342,614.45 figure represented not only the $265,093 that Menasha Corporation paid in sales or use taxes on the lease transaction but also an additional $77,521 in tax payments on $1,550,424 that Menasha Corporation paid to SAP for maintenance of the R/3 software. These facts are set forth in the petition for review (and its appendices) that Menasha Corporation filed with the Tax Appeals Commission.

The $77,521 in tax payments arising from Menasha Corporation and SAP's transactions for maintenance of the R/3 soft-

pertains solely to the $265,093 in sales or use tax payments arising from Menasha Corporation and SAP's $5.3 million transaction for the acquisition of SAP's R/3 software. The present case has nothing to do with the nontaxable $16,275,000 in consulting fees that Menasha Corporation paid in various transactions over the course of seven years for the purpose of customizing the R/3 software.

¶ 163. Those are the undisputed facts. I turn to the law and its application to the undisputed facts.

## II

¶ 164. The Department of Revenue promulgated Wis. Admin. Code § Tax 11.71 under its rule making authority.[36] Section 11.71, entitled "Computer industry," restates (among other matters) Wis. Stat. § 77.51(20) to provide that the receipts of the retail lease of "computer programs, except custom programs," are taxable[37] and defines terms relevant to taxation of the computer industry. Like the Tax Appeals Commission and the majority opinion, I look to the administrative rule to answer the legal question posed in the present case.

---

ware is no longer at issue. The parties settled their dispute about Menasha Corporation's liability for these taxes while proceeding before the Tax Appeals Commission. *See Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,848 (WTAC 2003). Under the parties' settlement agreement, Menasha Corporation received a partial refund of $38,760.

[36] Wisconsin Stat. § 277.11(2) and (2)(a) authorize an agency such as the Department of Revenue to "promulgate rules interpreting the provisions of any statute enforced or administered by it, if the agency considers it necessary to effectuate the purposes of the statute . . . ."

[37] Wis. Admin. Code § Tax 11.71(2).

¶ 165. Section 11.71(1)(e), (k) and (m) of the Wisconsin Administrative Code (Tax) defines the words "custom program" as used in § Tax 11.71 (and thus Wis. Stat. § 77.51(20)) as follows:

(e) **"Custom programs" mean utility and application software which accommodate the special processing needs of the customer.** The determination of whether a program is a custom program shall be based upon all the facts and circumstances, including the following:

1. The extent to which the vendor or independent consultant engages in significant presale consultation and analysis of the user's requirements and system.

2. Whether the program is loaded into the customer's computer by the vendor and the extent to which the installed program must be tested against the program's specifications.

3. The extent to which the use of the software requires substantial training of the customer's personnel and substantial written documentation.

4. The extent to which the enhancement and maintenance support by the vendor is needed for continued usefulness.

5. There is a rebuttable presumption that any program with a cost of $10,000 or less is not a custom program.

6. **Custom programs do not include basic operational programs or prewritten programs**.

7. If an existing program is selected for modification, there must be a significant modification of that program by the vendor so that it may be used in the customer's specific hardware and software environment.

667

. . . .

(k) **"Prewritten programs", often referred to as "canned programs", means programs prepared, held or existing for general use normally for more than one customer, including programs developed for in-house use or custom program use which are subsequently held or offered for sale or lease.**

. . . .

(m) . . . **For purposes of this section a program is either a prewritten or custom program.**[38]

¶ 166. When I apply the administrative rule to the undisputed facts, it is clear that the R/3 System is excluded from being a custom computer program under the very first sentence of the rule.

¶ 167. The first sentence of Wis. Admin. Code § Tax 11.71(1)(e) defines the term "custom programs" to "mean utility and application software which accommodate the special processing needs of the customer." The Tax Appeals Commission recognizes that the administrative rule's first sentence defines the term "custom programs." Quoting directly from the rule's first sentence, the Commission states that "[s]ection TAX 11.71(1)(e)(intro) *defines* custom programs 'as utility and application software which accommodate the special processing needs of the customer.' "[39] The Tax Appeals Commission is obviously correct that the ad-

---

[38] Wisconsin Admin. Code ch. Tax 11, including § Tax 11.71(1), is applicable to the state sales and use taxes imposed under Wis. Stat. §§ 77.51–.66. *See* Wis. Admin. Code § Tax 11.001(1).

[39] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,854 (WTAC 2003) (emphasis added).

ministrative rule's first sentence defines "custom programs." The first sentence begins, " 'Custom programs' *mean* . . . ." (emphasis added). The verb "mean" denotes definition.[40]

¶ 168. Although claiming to defer as a general matter to the Tax Appeals Commission's interpretation of the administrative rule, the concurrence apparently does not defer to the Commission's conclusion that the rule's first sentence defines "custom programs."[41] The concurrence also does not explain what the rule's first sentence means, or what function it serves, if it does not define "custom programs."

¶ 169. Everyone agrees that the R/3 System that Menasha Corporation acquired from SAP did not "accommodate the special processing needs of" Menasha Corporation.[42] Software that is leased in unmodified form to many customers and that does not provide

---

The Commission refers to "Section TAX 11.71(1)(e)(intro)." In legislative parlance, an introduction is "an unnumbered subunit of a section, subsection, paragraph, or subdivision of the statutes with a colon at the end followed by a list of two or more items in numbered subunits." Wisconsin Bill Drafting Manual 2007–2008, § 1.001(20) at 9. Accordingly, the Commission's reference to "Section TAX 11.71(1)(e)(intro)" is to all the text in Wis. Admin. Code § Tax 11.71(1)(e) preceding the rule's colon and numbered subunits.

[40] *See* Wisconsin Bill Drafting Manual 2007–2008, § 2.01(1)(i) at 39 ("In a definition do not use 'means and includes.' 'Means' is complete and 'includes' is partial. Using 'includes' allows a court or administering agency to adopt additional meanings; *using 'means' restricts them to reasonable constructions of your wording*.") (emphasis added).

[41] *See* concurring op., ¶¶ 115–116.

[42] As the majority opinion acknowledges, the R/3 System "did not provide adequate processing for Menasha." Majority op., ¶ 16.

adequate processing for any particular customer obviously does not accommodate the customer's special processing needs. Indeed Menasha Corporation had to expend more than $16 million over seven years to fit the R/3 System to Menasha's special processing needs.

¶ 170. The Tax Appeals Commission completely disregards the administrative rule's first sentence defining "custom programs." In its opinion, the Commission neither acknowledges nor explains its failure to apply the definition set forth in the rule. It appears that the Commission's error was inadvertent, not the result of a conscious determination that the administrative rule's definition of "custom programs" somehow is not controlling in the instant case. The Commission just seems to have forgotten that the definition is there.

¶ 171. The majority, however, certainly is aware that the definition is there. The Department of Revenue argues to this court that the rule's first sentence defining "custom programs" must be applied in deciding the instant case.

¶ 172. The Department of Revenue, for example, states in a brief to this court (using the words of the rule's first sentence) that the outcome in the present case depends upon "whether the software sold under the sales transaction with the seller accommodates the special processing needs of the customer . . . ."[43] In the same brief, the Department further argues that "[a]s purchased by Menasha under its software sales contract with SAP, R/3 was not 'custom' because it did not 'accommodate the special processing needs of the cus-

---

[43] Brief and Supplemental Appendix of Petitioner Wisconsin Department of Revenue in Response to Non-Party Brief of Wisconsin Manufacturers & Commerce at 11.

tomer' as required by subsection (e) of DOR's rule."[44] Again the Department relies on the first sentence.

¶ 173. During oral argument to this court, the Department of Revenue again stated its position that the court must apply the administrative rule's first sentence defining "custom programs" in determining whether the R/3 System is a "custom" program for purposes of the rule. Counsel for the Department of Revenue made the following statement to this court:

> [T]he rule says that "custom software" is software that accommodates the specific processing needs of the customer. The R/3 modules . . . as purchased by Menasha are not "custom software" within that definition because as purchased the modules did not accommodate the specific processing needs of Menasha. Menasha hired ICS so to customize the software so that it would accommodate Menasha's specific processing needs. . . .

When asked where in the rule counsel found this definition of "custom software," counsel referred the court to the first sentence of the rule.

¶ 174. Although the majority is aware that Wis. Admin. Code § 11.71(1)(e) defines the term "custom programs" in its first sentence, and although the majority is also aware that the Department of Revenue relies upon the definition set forth in the first sentence, the majority opinion does not apply the rule's definition of "custom programs"; does not explain why it does not apply the rule's definition of "custom programs"; and does not acknowledge the Department's argument that the rule's definition of "custom programs" should be applied.

---

[44] *Id.* at 12.

¶ 175. Instead of applying the definition as written, the majority opinion relies exclusively upon the rule's second sentence, which states that the determination of whether a program is "custom" shall be based on all the facts and circumstances. The majority opinion decides the present case simply by "weighing" the relevant facts and circumstances, as if Wis. Admin. Code § Tax 11.71(1)(e) did not define "custom programs" but instead merely set forth some sort of amorphous balancing test with no bottom line. The majority opinion concludes that the facts and circumstances "weigh in favor" of holding that the R/3 System that SAP leased to Menasha Corporation is a custom program. The majority opinion nowhere determines whether the facts and circumstances show that the R/3 System fits within the rule's definition stating that " '[c]ustom programs' mean utility and application software which accommodate the special processing needs of the customer."

¶ 176. The Tax Appeals Commission and the majority opinion clearly err in disregarding the administrative rule's first sentence defining "custom programs" and in relying exclusively on the rule's second sentence stating that the determination whether a program is custom shall be based on all the facts and circumstances. The rule's second sentence supports rather than displaces the definition set forth in the first sentence, instructing the court what factors to consider when determining whether a program accommodates the special processing needs of the customer.

¶ 177. For example, when a vendor enters into a transaction to sell a standardized software package but also agrees to modify the software for the customer (thus giving the software elements of both a prewritten program and a custom program), the software initially

672

meets the administrative rule's definition of a custom program. Then the factors set forth in the rule's second sentence must be examined to determine whether, under the totality of the circumstances, the program *is* a tax-free "custom" program accommodating the special processing needs of the customer. The second sentence, however, does not come into play when the program obviously is excluded from the definition of a custom program under the first sentence.

¶ 178. The rule's first sentence defining "custom programs" clearly provides the rule's bottom line. Put another way, although the application of the rule need not end with the first sentence in every case, it does begin with it. The dissent examines and applies both the first and second sentences of the rule. The majority opinion erroneously attends only to the second sentence and entirely ignores the first in deciding the instant case.

¶ 179. I could end the dissent right here. The plain language of the first sentence of Wis. Admin. Code § Tax 11.71(1)(e) leaves no doubt that the present case must be resolved in favor of the Department of Revenue. I shall, however, proceed to the administrative rule's second sentence and to the list of seven factors enumerated within the rule's text. The rule's second sentence and enumerated factors reinforce the rule's first sentence defining "custom programs."

¶ 180. The sixth enumerated factor, Wis. Admin. Code § Tax 11.71(1)(e)6., shows that the R/3 system cannot be a custom computer program. The sixth factor states that "[c]ustom programs do not include basic operational programs or prewritten programs." No one argues that the R/3 System is a basic operational program. Rather the dispute is whether it is a prewritten program. Prewritten programs are defined in Wis. Admin. Code § Tax 11.71(1)(k) as "programs prepared,

673

held or **existing for general use** normally for more than one customer."[45] Furthermore, § Tax 11.71(1)(m) states that a prewritten program for purposes of § 11.71 is either a prewritten or custom program.

¶ 181. The language of Wis. Admin. Code § 11.71(1)(e)6. and (m) make clear that if the R/3 System is a "prewritten program," it cannot qualify as a custom computer program. The Tax Appeals Commission understood that the rule's sixth factor has this meaning, stating that factor six "is as much a veto as a factor"[46] and that "[t]his case hinges on whether the R/3 System is a prewritten program."[47] The Commission's proper interpretation of the plain language of § Tax 11.71(1)(e)6. as a veto is further supported by Wis. Admin. Code Tax § 11.71(1)(m), which provides that for purposes of § Tax 11.71, "a program is either a prewritten program or a custom program," not both.

¶ 182. Although conceding that the R/3 System is "existing rather than created"[48] and is leased in identical form to a large number of customers, the Tax Appeals Commission and the majority opinion shockingly conclude, contrary to the very words of the rule, that the R/3 System does not exist for general use by more than one customer.

---

[45] Wis. Admin. Code § Tax 11.71(1)(k).

[46] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,855 (WTAC 2003).

Strangely, the majority opinion does not appear to defer to the Commission's conclusion that factor 6 functions as a veto. The majority opinion determines, in contradiction to the Commission, that factor 6 cannot alone be dispositive of the question whether a computer program is custom. *See* majority op., ¶ 92.

[47] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,855 (WTAC 2003).

[48] Majority op., ¶ 88.

¶ 183. The Tax Appeals Commission reaches this conclusion in disobedience of the plain language of the administrative rule, explaining that the only "use" of the R/3 System was its use after extensive post-sale modification had customized the software to Menasha Corporation's particular business needs. As the majority opinion states, the Tax Appeals Commission reasons that the R/3 System does not exist for general use because the software is "useless until modified."[49]

¶ 184. According to the Tax Appeals Commission, "[t]he distinction between custom and prewritten programs hinges on the amount of effort necessary to get the software operational for a particular customer's needs."[50]

¶ 185. Put another way, the Tax Appeals Commission concludes that SAP's sophisticated business customers pay millions of dollars to acquire software that has no use and is useless in the form purchased. Nonsense! Menasha Corporation paid $5 million for software that it knew had a use and that it knew would be useful to it: Menasha used, and paid a lot of money to use, the R/3 System as a rudimentary business and accounting software system that advanced Menasha Corporation's ability to build its own business and accounting software system that met Menasha's Corporation's particular needs.

¶ 186. The Tax Appeals Commission's decision rests on converting the words "existing for general use" in the administrative rule's definition of prewritten

---

[49] *Id.*, ¶ 89.

[50] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,856 (WTAC 2003). The Tax Appeals Commission decided that "[t]he issue is not whether the end result is a program that provides standard business application, but rather the obstacles one must overcome to get to apply the software." *Id.* at 32,855.

program to the words "ready for use off-the-shelf" without any modification[51] It is unreasonable to interpret the words "existing for general use" as "ready for use off-the-shelf" without any modification. Reasonably construed, the words "existing for general use" mean just what they say: that the program exists (as opposed to a program that must be created at the customer's order) and is suitable for general use (as opposed to the special use of one customer). The text of the administrative rule says nothing about whether a program is "ready for use off-the-shelf" without any modification.

¶ 187. The R/3 System that SAP leased to Menasha clearly falls within the administrative rule's definition of prewritten program. Because factor six (and (1)(m)) act as a "veto," rendering prewritten programs and custom programs mutually exclusive, the R/3 System cannot be a custom program under Wis. Admin. Code § Tax 11.71(1)(e).

¶ 188. The Tax Appeals Commission concluded that although "SAP admitted that the R/3 software is prewritten and subject to the sales and use tax," and although SAP "backed up" this admission by paying taxes on past sales of the R/3 software and agreeing to collect sales and use taxes on future sales, SAP's admission and actions have "no value" in the instant case and are not "probative."[52] The Tax Appeals Commission's position that SAP's admission and actions have no value and are not probative is not reasonable. How can the seller's agreement that its own software is taxable as "prewritten" software be without any probative value?

---

[51] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,855 (WTAC 2003).

[52] *Id.* at 32,854.

¶ 189. In sum, the Tax Appeals Commission's interpretation and application of the administrative rule's sixth factor is unconvincing for several reasons.

¶ 190. First, nothing in the words of the administrative rule supports the Tax Appeals Commission's interpretation of Wis. Admin. Code § Tax 11.71(1)(e)6. changing the words "general use" to read "ready for use off-the-shelf" without any modification. The words "ready for use off-the-shelf" without any modification are conspicuously absent from the text of Wis. Admin. Code § Tax 11.71(1)(k). The administrative rule's text does not require that the "use" of a prewritten program must be use of the program off the shelf and without modification.

¶ 191. Second, the Tax Appeals Commission's interpretation of "prewritten program" in Wis. Admin. Code § Tax 11.71(1)(k) as ready for use off the shelf without any modification is not only contrary to the words of the rule but also contravenes the history of the administrative rule.[53] The history behind the rule shows that the majority opinion rewrites the text of

---

[53] The Department of Revenue promulgated Wis. Admin. Code § Tax 11.71 in 1986. 361 Wis. Admin. Reg. 28 (Jan. 15, 1986). The Department amended Wis. Admin. Code § Tax 11.71 once, in 1993. 447 Wis. Admin. Reg. 24 (Mar. 14, 1993). Among other things, this amendment added language to Wis. Admin. § Tax 11.71(1)(e)6. clarifying the Department's position that custom programs do not include prewritten programs. Under the then-existing statute, the Department of Revenue had considered "prewritten programs" as taxable.

The legislature amended Wis. Stat. § 77.51(20) in 1992 to provide that "tangible personal property" includes "computer programs except custom computer programs." 1991 Wis. Act 269. According to a Department of Revenue memo included in the drafting file for the 1992 amendment, the object of this amendment was to adopt the Department's interpretation of computer

Wis. Admin. Code § Tax 11.71(1)(k) to include the very language that the Department of Revenue expressly refused to put in the rule at the time of the rule's promulgation.

¶ 192. The computer industry apparently lobbied the Department during the promulgation of Wis. Admin. Code § Tax 11.71 to define "prewritten programs" as programs that are ready for use off the shelf. When the Department was preparing the definition of "prewritten programs" in Wis. Admin. Code § Tax 11.71(1)(k), an attorney representing the computer industry (the very same attorney, as it happens, who represented Menasha Corporation before the Tax Appeals Commission in the present case) lobbied the Department to define "prewritten programs" as programs intended for general use "and mass distribution *as prepackaged ready-to-use programs*" (emphasis added).[54]

¶ 193. The Department expressly denied the attorney's request, stating that it would stick with "the prewritten program definition we originally used."

¶ 194. The Department's refusal to define "prewritten programs" as "prepackaged ready-to-use programs" stemmed from its longstanding position that prewritten programs need not be ready for use off-the-shelf. In two "technical information memoranda" dated April 2, 1976, and August 7, 1978, the Department of Revenue defined the term "prewritten (canned) programs" as "programs prepared, held or existing for general or repeated use, including programs developed for in-house use and subsequently held or offered for

programs (except custom computer programs) as tangible personal property. Drafting File, 1991 Wis. Act 269, Legislative Reference Bureau, Madison, Wis.

[54] The record contains a letter that the Department of Revenue sent to the attorney in response to his request.

sale or lease."[55] The technical information memoranda elaborated upon this definition by explaining that "prewritten (canned) programs" need not be ready for use off-the-shelf. The memoranda stated that "[i]n some cases [prewritten programs] are usable as written" but that "in most cases it is necessary that the program be modified, adapted and tested to meet the customer's particular needs."[56]

[55] DOR Tech. Info. Mem. 38.4 (Aug. 7, 1978); DOR Tech. Info. Mem. 38.1 (Apr. 2, 1976).

This definition of "prewritten (canned) programs" is nearly identical to the definition of "prewritten programs" now set forth in the text of Wis. Admin. Code § Tax 11.71(1)(k).

Although the Department of Revenue's technical information memoranda are not binding upon the Department, the Department may be equitably estopped from collecting taxes in a manner inconsistent with the positions set forth in its technical information memoranda. *See DOR v. Family Hosp., Inc.*, 105 Wis. 2d 250, 255–56, 313 N.W.2d 828 (1982) (holding that the Department was equitably estopped from collecting a certain tax from the defendant hospital when the hospital had reasonably relied to its detriment upon a DOR technical information memorandum stating that hospitals were exempt from the tax).

[56] DOR Tech. Info. Mem. 38.4 (Aug. 7, 1978); DOR Tech. Info. Mem. 38.1 (Apr. 2, 1976).

The Department of Revenue also remained consistent in its position after promulgating Wis. Admin. Code § Tax 11.71. For example, in a 1992 "tax release," the Department stated that under Wis. Stat. § 77.51(20) (as amended by 1991 Wis. Act 269), "[a]ny customizing, other than changes made by the vendor prior to sale or license, does not affect the taxability of the sale." *Wis. Tax Bull.* 79, Oct. 1992, at 23. The DOR also has published one additional tax release, as well as eight private letter rulings, interpreting Wis. Stat. § 77.51(20) and Wis. Admin. Code § Tax 11.71 consistently with the Department's longstanding position that the distinction between "custom" and "prewritten" programs does not hinge upon whether a program is ready for use

¶ 195. Third, the Tax Appeals Commission's decision yields unreasonable and absurd results. In its decision the Commission considers the Menasha Corporation's seven-year history working with the R/3 System in determining that the R/3 System was not a prewritten program because it was "useful only after a significant investment of resources in planning, testing, training, enhancement, and maintenance . . . ."[57] Yet the seller and buyer need to determine the taxability of the transaction in the year the agreement is completed. At the time of the agreement, the vendor and customer may not know what future steps the customer may take to customize the software to its own needs, or how

off the shelf. *See Wis. Tax Bull.* 122, Oct. 2000, at 42 ("Modifications made by Customer D or other third parties, subsequent to the initial licensing [of a computer program], do not impact on the determination of taxability at the time of sale."). *See also Wis. Tax Bull.* 111, Oct. 1998, at 33–38 (Private Letter Rulings W9831006 & W9832007); *Wis. Tax Bull.* 107, Apr. 1998, at 31–33 (Private Letter Ruling W9810003); *Wis. Tax Bull.* 91, Apr. 1995, at 33–37 (Private Letter Ruling W9452010); *Wis. Tax Bull.* 81, Apr. 1993, at 31–34 (Private Letter Rulings W9251014 & W9253016); *Wis. Tax Bull.* 78, July 1992, at 19–20 (Private Letter Ruling W9214005); *Wis. Tax Bull.* 76, Apr. 1992, at 19–20 (Private Letter Ruling W9202001).

The *Wisconsin Tax Bulletin,* a quarterly newsletter that includes the Department of Revenue's published tax releases and private letter rulings, is available at the Department's Web site, http://www.revenue.wi.gov/ise/wtb/index.html (last visited June 30, 2008).

Under Wis. Stat. § 73.035, the DOR may issue and publish a private letter ruling in response to a request for a ruling about facts relating to a tax that the DOR administers. A private letter ruling does not bind the requester and may not be appealed. Wis. Stat. § 73.035(2).

[57] *Menasha Corp. v. DOR,* Wis. Tax Rptr. (CCH) 400–719, at 32,856 (WTAC 2003).

much the customer may invest relative to the purchase price.

¶ 196. Fourth, the Tax Appeals Commission's interpretation of Wis. Admin. Code Tax § (1)(e)6. reduces the factor to mere surplusage. Thus the Tax Appeals Commission bases its interpretation of factor six largely on the rule's first four factors, each of which (according to the Commission) "hinges on the degree to which the software is ready for use off-the-shelf."[58] Why conclude that factor six seeks to measure the same attributes of the software program that the other factors measure? The plain language of enumerated factor six does not refer to the other five preceding factors. Each factor in the definition of "custom program" is independent of the others, and each must be interpreted individually based on the plain language of the rule.

¶ 197. Factor six states simply that "custom program" does not include a prewritten program. The other enumerated factors do not influence the plain language of enumerated factor six. By interpreting factor six to mean nothing more than the combined meaning the first four factors, the Tax Appeals Commission reduced factor six to surplusage.

¶ 198. Again, I could end the dissent here. Like the first sentence of Wis. Admin. Code § Tax 11.71(1)(e) defining "custom programs," the rule's definition of "prewritten programs" and the veto provision in the rule's sixth factor clearly demonstrate that the R/3 System is not a custom program. Nevertheless, I will address two other errors in the Tax Appeals Commission's decision that render the decision in conflict with the plain text of the administrative rule.

---

[58] *Id.* at 32,855. *See also id.* at 32,856.

¶ 199. The Tax Appeals Commission errs in interpreting enumerated factor two, which has two parts: (1) "[w]hether the program is loaded into the customer's computer by the vendor" and (2) "the extent to which the installed program must be tested against the program's specifications."[59]

¶ 200. With regard to the first part, the Tax Appeals Commission found that "the fact that a former SAP employee loaded the [R/3] software weighs in favor of a finding that the software at issue is custom software."[60] The Commission's finding ignores the plain language of the rule, which requires that the program is loaded "by *the vendor*" (emphasis added). A former employee of the vendor is not the vendor.

¶ 201. The language of the rule is clear, and the Tax Appeals Commission's interpretation and application of factor two is inconsistent with the language of the administrative rule. The Commission did not apply the "by the vendor" language literally. The Commission's interpretation is unreasonable.

¶ 202. Finally, the Tax Appeals Commission does not account for the seventh factor. The seventh factor states, "If an existing program is selected for modification, there must be a significant modification of that program by the vendor so that it may be used in the customer's specific hardware and software environment." Wis. Admin. Code § Tax 11.71(1)(e)7.

¶ 203. The Tax Appeals Commission concluded that the reference in factor seven to " 'existing program' means an 'existing program for general use' as that phrase is used in the definition of 'prewritten pro-

---

[59] Wis. Admin. Code § Tax 11.71(1)(e)2.

[60] *Menasha Corp. v. DOR*, Wis. Tax Rptr. (CCH) 400–719, at 32,855 (WTAC 2003).

grams . . . .' "[61] The Commission then determined that, because the Commission had already concluded that the R/3 System is not a prewritten program, "this factor does not come into play."[62] According to the Tax Appeals Commission, the seventh factor comes into play only if the software is prewritten.

¶ 204. The Tax Appeals Commission's reasoning is odd. As counsel for Menasha Corporation has explained, the Commission's decision does not apply factor seven literally.[63] Furthermore, the Commission's conclusion that factor seven comes into play only when a program is prewritten implies that factor seven is surplusage. As the Commission itself seemed to recognize, the "veto" provision in factor six states that any program which is prewritten cannot be a custom program. If factor seven comes into play only when a program is prewritten, it thus has no effect.

¶ 205. In sum, I agree with the circuit court. I would apply Wis. Admin. Code § Tax 11.71(1)(e), (k), and (m) according to their clear text and would conclude that the R/3 System that SAP leased to Menasha is not a "custom program" as that term is defined in the text of the rule. It is undisputed that the R/3 software that SAP leased to Menasha Corporation did not "accommodate the special processing needs of the customer." Rather, the exact same package of 70 software modules was sold to thousands of different customers regardless of each customer's individual processing needs. The R/3 System is a "prewritten program" al-

---

[61] *Id.* at 32,856.

[62] *Id.*

[63] *See* Foley and Lardner LLP, Legal News: Federal and State Controversy, Apr. 2004, at 6, *available at* http://www.foley.com/publications/newsletters_archive.aspx?year_2004 (last visited June 30, 2008).

ready existing for general use, not a program created or customized for Menasha's special use. Because the R/3 System was not customized, Menasha Corporation had to enter into separate service contracts, subsequent to licensing the software, to customize the software to meet Menasha Corporation's special processing needs.

¶ 206. To reach a result favorable to Menasha Corporation, the Tax Appeals Commission and the majority opinion do violence to the plain language of Wis. Admin. Code Tax 11.71(1). The Tax Appeals Commission and majority opinion reach their holding in the only way they can: by disregarding the definition of "custom programs" set forth in Wis. Admin. Code § Tax 11.71(1)(e) and by rewriting the definition of "prewritten programs" set forth in Wis. Admin. Code § Tax 11.71(1)(k).

¶ 207. For the reasons set forth, I dissent.

¶ 208. I am authorized to state that Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this dissent.

¶ 209. ANN WALSH BRADLEY, J. (dissenting). Here's the $300 million[1] question: did the R/3 computer program "accommodate the special processing needs" of Menasha? That's the question that the first sentence of Wis. Admin. Code § TAX 11.71(1)(e) requires that we ask. The Commission doesn't answer it, the majority doesn't answer it, and the concurrence doesn't answer it.

¶ 210. Not one of them answers the question in the affirmative. They can't because the 70 disks of the R/3 system did not accommodate the special processing

---

[1] See Legislative Fiscal Bureau revenue and expenditure projections, January 30, 2007, 4. Available at http://www. legis.state.wi.us/lfb/Misc/2007_01_30_"revenueestimates.pdf" (last visited June 25, 2008).

needs of Menasha. Not one of them answers the question in the negative. They can't because doing so would undermine their conclusions. We therefore get three separate writings, totaling more than 100 pages of text, where no one addresses the very first sentence of a rule they purport to interpret.

¶ 211. I join the dissent of Chief Justice Abrahamson. I write separately, however, to address the issue of deference and to emphasize the failure of the Commission, the majority, and the concurrence to ask and answer this necessary question.

¶ 212. In a case where there are differing reasonable interpretations, deference is often given. An interpretation is not reasonable, however, if it ignores the language of the rule or if it is inconsistent with that language. *Pfeiffer v. Board of Regents of the University of Wisconsin System*, 110 Wis. 2d 146, 154–55, 328 N.W.2d 279 (1983).

¶ 213. Instead of interpreting the language of Wis. Admin. Code § TAX 11.71(1)(e), the Commission altogether ignored the first sentence of the rule it purported to be interpreting. How can we defer to an interpretation of language when no such interpretation exists? The majority follows the Commission in failing to provide any analysis of the first sentence.

¶ 214. As a result of ignoring the first sentence of the rule, the agency here has reached an interpretation that is inconsistent with that sentence. This court gives no deference to an agency's interpretation of a rule that is inconsistent with the language of that rule. *Pfeiffer*, 110 Wis. 2d at 154–55.

I

¶ 215. The issue here is the interpretation of Wis. Admin. Code § TAX 11.71(1)(e). The first part of the section states as follows:

"Custom programs" mean utility and application software *which accommodate the special processing needs of the customer*. The determination of whether a program is a custom program shall be based upon all the facts and circumstances, including the following . . . .

(Emphasis added.)

¶ 216. The very first sentence of the rule sets forth the definition of "custom programs," and the question in this case is whether the software here fits within the definition of a "custom program." However, the Commission never turns its attention to the definition.

¶ 217. We give agencies varying degrees of deference in interpreting their own rules. *See Daimler-Chrysler v. Labor & Indus. Review Comm'n*, 2007 WI 15, ¶ 15, 299 Wis. 2d 1, 727 N.W.2d 311. The key premise to that principle is that the agency actually renders an interpretation. In this case, the Commission ignored the defining sentence. It did not even render an interpretation of "custom programs . . . which accommodate the special processing needs of the customer."

¶ 218. How can we give deference to a nonexistent interpretation?

¶ 219. The answer, of course, is that we can't. We owe no deference whatsoever to an agency's failure to interpret a definition clearly set forth in the Wisconsin Administrative Code.

¶ 220. The concurrence attempts to circumvent this problem by claiming that the first sentence is merely part of the definition of custom programs. It accuses the dissents of taking "eight words of a sentence *from* the definition and saying it *is* the definition." Concurrence, ¶ 116 (emphasis in original). Instead, the

concurrence argues that we should give controlling weight deference to the Commission's interpretation.

¶ 221. Yet the concurrence contradicts the Commission outright. The Commission explicitly determined that section 11.71(1)(e) defines "custom programs" in its first sentence. In its decision in this case, the Commission stated:

> "Section TAX 11.71(1)(e)(intro) *defines* custom programs as 'utility and application software *which accommodate the special processing needs of the customer.*' " (Emphasis added.)

In other words, the Commission agrees with the dissents in this regard.[2]

¶ 222. Despite the concurrence's protests that it is giving deference to the Commission, its central argument overturns the Commission's explicit determination.

## II

¶ 223. Not only does the Commission fail to analyze the most fundamental provision in the rule—the

---

[2] As an explanation for why the Commission failed to analyze the definition of "custom programs," the concurrence offers a strained interpretation. It surmises that the use of "intro" by the Commission clearly meant that the first sentence of the rule is merely "prefatory material," implying that it is not the definition of "custom programs." Concurrence, ¶ 115 n.3. The use of "intro" carries no such implication.

As noted in Chief Justice Abrahamson's dissent, the use of "intro" simply means that language is "preceding the rule's colon and numbered subunits." Chief Justice Abrahamson's dissent, ¶ 167 n. 39; *see* Wisconsin Bill Drafting Manual 2007–08, § 1.001(2) at 9. The use of "intro" certainly does not contradict the Commission's clear statement that the first sentence defines "custom programs."

first sentence—it renders an interpretation that directly contradicts that unambiguous provision.

¶ 224. The Commission, as well as the majority and the concurrence, makes the mistake of interpreting the factors listed in section 11.71(1)(e) as the only things to consider when determining whether a computer program is custom. However, if one looks at the factors in conjunction with the definition of "custom programs," it is clear that the factors are based on the assumption that the program in question actually meets the needs of the customer. The factors must be examined in order to determine whether the needs met by the software are "special."

¶ 225. The factors operate within the premise set forth in the very first sentence of the rule: that software *"accommodate[s] the special processing needs of the customer."* They cannot operate to contradict it.[3] The concurrence's claim that the dissents render the rest of the rule "surplusage" misses the mark. The dissents are clear: the factors must be considered, but they cannot be deployed to contradict the definition set forth in the first sentence of the rule.

---

[3] In other words, whether there was extensive presale consultation and analysis is a factor in determining whether the needs met by the software are special to the customer. If the software does not meet the customer's needs (be they special or general), the software is not custom. Likewise, whether the program is loaded by the vendor, the extent of training required, the amount of maintenance support, the cost of the system, whether the software is a basic operational or prewritten program, and whether an existing system is significantly modified, go to the question of whether any needs accommodated by the software are special to the customer. *See* Wis. Admin. Code § TAX 11.71(1)(e)1–7.

¶ 226. It is undeniable that the R/3 system purchased—the 70 disks containing prewritten software—did *not* "accommodate the special processing needs of the customer." The processing needs of the customer, Menasha, were only accommodated after other modifications were made.

¶ 227. Put another way, the Commission interpreted section 11.71(1)(e) such that software which does *not* accommodate the special needs of the customer is a "custom program," which in turn is defined as software that *does* accommodate the special needs of the customer. "Does not accommodate" is the opposite of "does accommodate."

¶ 228. The Commission's interpretation led it to a conclusion that software which does *not* accommodate the special processing needs of the customer is "custom." Such an interpretation is thus inconsistent with the plain words of the rule. Because that's what the Commission's interpretation has done, we owe it no deference.

¶ 229. Like the Commission and the concurrence, the majority utterly ignores the first sentence of rule. It does not provide a single word explaining how its conclusion comports with the requirement that custom programs "accommodate the special processing needs of the customer."

¶ 230. The closest the majority comes to such an analysis is its statement that "the rule does not end with the first sentence." Majority op., ¶ 106. I agree— but it most assuredly begins there.

¶ 231. Because its analysis ignores the first sentence and renders an interpretation inconsistent with the language of the rule, we owe no deference to the Commission's interpretation. I therefore respectfully dissent.

¶ 232. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this dissent.